Joseph Prencipe (Bar No. 302787)
joe@optimistlegal.com
OPTIMIST LEGAL PC
f/k/a/ OMEED LAW PC
2219 MAIN ST #325
SANTA MONICA, CA 90405
Telephone: (310) 728-9994

Attorneys for Plaintiff
ANDRÉ ELIJAH IMMERSIVE, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ANDRE ELIJAH IMMERSIVE INC.**, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>**META PLATFORMS TECHNOLOGIES, LLC**, f/k/a Facebook Technologies, LLC, a Delaware limited liability company;<br><br>**CHRIS PRUETT**, an individual;<br><br>**MARK ZUCKERBERG**, an individual;<br><br>**ANAND DASS**, an individual;<br><br>**CHRIS PAPALEO**, an individual;<br><br>**ALO LLC**, a California limited liability company;<br><br>**SAVIO THATTIL**, an individual;<br><br>**NATASHA TRINDALL**, an individual;<br><br>**ROBOT INVADER, INC.**, a Delaware corporation; and<br><br>**DOES 1-20**,<br><br>Defendants. | CASE NO.:  3:23-cv-5159<br><br>**PLAINTIFF'S COMPLAINT FOR:**<br><br>**(1) FIRST VIOLATION OF SHERMAN ACT §1**<br>**(2) SECOND VIOLATION OF SHERMAN ACT §1**<br>**(3) VIOLATION OF SHERMAN ACT §2**<br>**(4) BREACH OF WRITTEN CONTRACT**<br>**(5) PROMISSORY ESTOPPEL**<br>**(6) QUANTUM MERUIT**<br>**(7) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>**(8) INTENTIONAL INTERFERENCE WITH A CONTRACT**<br>**(9) INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS**<br>**(10)  NEGLIGENT MISREPRESENTATION**<br><br>**DEMAND FOR JURY TRIAL** |

1    Plaintiff Andre Elijah Immersive Inc. alleges as follows for his complaint against

2 Defendants:

3                                    **INTRODUCTION**

4    1.    **This is a case about a Silicon Valley Vertical Monopoly pushing a new**

5 **market entrant out of the fastest growing markets in human history.**

6    2.    Defendant Meta has a vertical monopoly in the markets of personal social

7 networking, Virtual Reality ("VR") Headsets, VR App Distribution, VR App Development, and

8 VR Fitness Apps.

9    3.    Defendant Meta in recent years has set its sights on creating, and ultimately

10 *controlling*, the virtual reality "metaverse." To understand what the "metaverse" is, think of it as

11 the new frontier of computing that is replacing traditional keyboard-and-mouse computers with

12 VR headsets and apps.

13    4.    In order to demonstrate its newly established intent to control the metaverse,

14 Defendant Meta even went so far as to change its name from "Facebook" to "Meta" (however

15 garish it may be).

16    5.    Defendant Meta has made these drastic changes because it believes that these

17 markets are the fastest growing markets in human history – and it is correct in that belief.

18    6.    Plaintiff AEI is a new market entrant in the rapidly growing market of VR Fitness

19 Apps. The VR Fitness App market is currently worth $16.4bn as of 2022, and is expected to

20 grow rapidly at a 26.72% compound annual growth rate all the way up to **$109.04bn in 2030**.

21    7.    Plaintiff AEI developed a new VR Fitness App with Defendant Meta and

22 Defendant Alo (the "AEI Fitness App"). Plaintiff spent a whole year exhaustively developing

23 that new app. Plaintiff bustled with some of the best VR programmers in the world from August

24 2022 to August 2023 to bring it to life. And so he did: they achieved completion that same

25 month.

26    8.    The AEI Fitness App was poised to become one of the dominant market leaders in

27 the VR Fitness App market.

28

9.      Defendant Alo is also known as "Alo Yoga", and is one of the top brands in the fitness world. Alo agreed with Plaintiff that the AEI Fitness App will use the "Alo" brand. This would make the AEI Fitness App one of the most recognizable VR Fitness Apps in the world.

10.     And even further: the AEI Fitness App features the best and most widely-recognized yoga instructors in the world. Users can login to the app and take lessons from these instructors in virtual reality *right now*. *It's already been developed*. These instructors have over 600,000 avid fitness followers. Their following, along with their brand images, would also make the AEI Fitness App one of the most recognizable VR Fitness Apps in the world.

11.     Defendant Meta agreed to launch the AEI Fitness app at Meta Connect 2023 in September 2023, the single biggest virtual reality conference in the world. Apps which launch there by Meta get publicity across all major relevant publications all around the world. This launch would propel the AEI Fitness App to the forefront of the VR Fitness App market and give it significant market share; and, indeed, that was the exact plan as strategized by the Plaintiff and Defendants.

12.     Apple and Pico, who are competitors of Meta in the VR Headset and VR App Distribution markets, also agreed to launch the AEI Fitness App on their platforms within the next 1-2 years.

13.     Due to the massive recognition, the massive branding, and the massive launch, the AEI Fitness App was poised to become a massive competitor in the VR Fitness App market. It would have generated massive revenue in the millions in the near-term, and hundreds of millions in the long-term. Plaintiff was to receive part of those revenues.

14.     However, all the efforts, plans, and dreams of the parties would not come to fruition. It would not be. For, Defendant Meta had an entirely different, predatory plan it sought to implement.

15.     Within just days of the scheduled launch of the AEI Fitness App, Meta learned that the AEI Fitness App was going to launch on Apple and Pico also. And so, with this new information in hand, Meta, and each of the other Defendants, conspired, colluded, aided-and-

1  abetted one another, and acted in concert, to put an end to the AEI Fitness App, and to

2  proverbially **nail its coffin shut** so that it could **never see the light of day**.

3       16.     By doing so, Meta moved one step closer in controlling the entire "metaverse" –

4  in controlling the markets for VR Headsets, VR App Distribution, VR App Development, and

5  VR Fitness Apps.

6       17.     With their collusive agreement in hand, the Defendants, without right, power,

7  privilege, or any justification whatsoever, communicated to Plaintiff that they would cease

8  working with him related to the AEI Fitness App, would immediately cease communicating with

9  him, and would immediately terminate their agreements to work together.

10      18.     Then, the Defendants informed Plaintiff that he was not allowed to launch the

11 AEI Fitness App at Meta Connect 2023. And even worse, they *banned* Plaintiff from even

12 *attending* the event himself.

13      19.     And, lastly, just to strike one final low-blow to the Plaintiff, the Defendants

14 decided to *stiff* him: they refused to pay him $1,500,000 which they owe to him under the

15 agreements right now, and another $1,700,000 which they will owe to him in the near-term.

16      20.     This is all very harsh, it may seem, but it is nothing compared to the lost revenues

17 that Plaintiff is going to face due to the trashing of the app. Plaintiff will face lost revenues in the

18 long-term upwards of $25,000,000, to be established by an expert witness at trial.

19      21.     Putting all of the actions of Defendants together, they have also utterly and

20 irreparably damaged Plaintiff's brand image and good will in the sum of $25,000,000, also to be

21 established by an expert witness at trial.

22      22.     Defendants' acts were clearly in violation of Sections 1 and 2 of the Sherman

23 Antitrust Act, as detailed further herein, and such monopolizing behavior is viewed with the

24 utmost scrutiny in the American legal system. For such violations, Plaintiff seeks another

25 $100,000,000 in damages, to be established by an expert witness at trial, then statutorily three-

26 folded to $300,000,000, in addition to attorneys' fees, cost of suit, and prejudgment interest, and

27 also to be established by an expert witness at trial.

28      23.     Taken together, Plaintiff seeks $353,200,000.

1    24.    This Court must act to protect the citizens of the United States from this abusive

2    and anticompetitive behavior.

3    25.    This Court must grant judgment against the Defendants for violations of the

4    Sherman Act, breach of contract, and other counts, and grant Plaintiff damages therefor.

5                                            **PARTIES**

6    26.    Defendant Meta Platforms Technologies, LLC, is a publicly traded, for-profit

7    company, incorporated as a limited liability company in Delaware with a foreign filing in

8    California, and with principal place of business at 1601 Willow Road, Menlo Park, CA 94025

9    ("**Meta**"). Facebook's principal businesses are in technologies that facilitate digital interactions

10   and communications, including the Meta VR Headset, commonly known as Meta Quest, which

11   enables social networking in virtual reality; Meta Quest App Store, which enables the purchase

12   and use of social networking apps through distribution; Facebook Blue, which provides personal

13   social networking; Instagram, which provides personal social networking; Facebook Messenger,

14   which provides mobile messaging services; and WhatsApp, which provides mobile messaging

15   services.

16   27.    Defendant Mark Zuckerberg is a California resident and the Chairman and CEO

17   of Defendant Meta ("**Zuckerberg**"). Defendant Zuckerberg conspired and colluded with, acted

18   in concert with and aided and abetted, Defendant Meta and Defendant Pruett to violate the

19   Sherman Act as further described herein.

20   28.    Defendant Chris Pruett is a California resident and an employee of Defendant

21   Meta ("**Pruett**"). Defendant Pruett directly performed the acts and omissions which comprise the

22   violations of the Sherman Act as further described herein, as well as conspired and colluded

23   with, acted in concert with and aided and abetted, each of the other Defendants in doing so.

24   29.    Defendant Anand Dass is a California resident and an employee of Defendant

25   Meta ("**Dass**"). Defendant Dass directly performed the acts and omissions which comprise the

26   violations of the Sherman Act as further described herein, as well as conspired and colluded

27   with, acted in concert with and aided and abetted, each of the other Defendants in doing so.

28

30.     Defendant Chris Papaleo is a California resident and an employee of Defendant Meta ("**Papaleo**"). Defendant Papaleo directly performed the acts and omissions which comprise the violations of the Sherman Act as further described herein, as well as conspired and colluded with, acted in concert with and aided and abetted, each of the other Defendants in doing so.

31.     Defendant Alo LLC is a limited liability company incorporated in California with principal place of business at 9830 Wilshire Blvd, Beverly Hills ("**Alo**"). Defendant Alo directly performed the acts and omissions which comprise the violations of the Sherman Act as further described herein, as well as conspired and colluded with, acted in concert with and aided and abetted, each of the other Defendants in doing so.

32.     Defendant Savio Thattil is a California resident and the CTO of Defendant Alo ("**Thattil**"). Defendant Thattil directly performed the acts and omissions which comprise the violations of the Sherman Act as further described herein, as well as conspired and colluded with, acted in concert with and aided and abetted, each of the other Defendants in doing so.

33.     Defendant Natasha Trindall is a California resident and a General Manager of Defendant Alo ("**Trindall**"). Defendant Trindall directly performed the acts and omissions which comprise the violations of the Sherman Act as further described herein, as well as conspired and colluded with, acted in concert with and aided and abetted, each of the other Defendants in doing so.

34.     Defendant Robot Invader is a Delaware corporation with principal place of business at 19925 Stevens Creek Blvd., Ste 100, Cupertino, CA 95014 ("**Invader**"). Defendant Invader directly performed the acts and omissions which comprise the violations of the Sherman Act as further described herein, as well as conspired and colluded with, acted in concert with and aided and abetted, each of the other Defendants in doing so.

35.     Plaintiff is unaware of the true names and capacities of Defendants DOES 1 through 20, inclusive, and therefore sues those parties by fictitious names ("**DOES 1-20**") (all of the above, taken together, the "**Defendants**"). Plaintiff alleges that DOES 1-20 are responsible in some manner for the events herein. Plaintiff will seek leave to amend the Complaint to state the

1  true names and capacities of DOES 1-20 when they have been ascertained or their liability is

2  discovered.

3      36.     Upon information and belief, at all relevant times herein alleged, each of the

4  Defendants colluded, conspired with, acted in concert with, and aided and abetted each other to

5  commit the wrongs against Plaintiff. Upon information and belief, Plaintiff alleges that at all

6  times herein mentioned, each Defendants was also the agent, servant, joint venturer, partner,

7  successors-in-interest, predecessors-in-interest, co-venturer, co-owner, purported co-author or

8  joint author, alter ego, and/or employee of each and every other Defendant, and was acting

9  within the course and scope of its authority, and each Defendant ratified, authorized, and

10 approved the acts of each other Defendant. Plaintiff is hereby informed and believes and thereon

11 alleges that any act or omissions attributed herein to a corporation or other business entity were

12 authorized acts, performed by an authorized representation of said entity, acting within the

13 course and scope of its agency or authority, and were ratified by reasonable representatives of the

14 entity. Upon information and belief, each of the Defendants agreed to a common plan or design

15 to commit the tortious acts described below, had actual knowledge that the unlawful conduct was

16 planned, and concurred in the scheme with knowledge of its unlawful purpose.

17                          **JURISDICTION; VENUE**

18      37.     This Court has subject matter jurisdiction because federal courts have exclusive

19 jurisdiction over federal antitrust claims, and this is an antitrust claim by a private party injured

20 in his business or property by reason of anything forbidden in the antitrust laws (15 U.S.C. §4).

21      38.     This Court has supplemental jurisdiction over each of the state law claims.

22      39.     This Court has personal jurisdiction over the defendants because:

23          a.   Defendant Meta consented to personal jurisdiction here by and through the

24               Professional Services Agreement, a true and correct copy of which is attached as

25               **Exhibit 1**;

26          b.   the other Defendants are domiciled in this State; and

27

28

c.  each of the Defendants has extensive minimum contacts with the State of California such that the exercise of jurisdiction does not offend the traditional notions of fair play and substantial justice:

    i.  each of the Defendants has purposefully availed themselves of the benefits of and directed their activities to the forum state. Each of the Defendants purposefully directed their activities to the forum state by committing an intentional act of breach the contract with and violating the Sherman Act expressly aimed at the Plaintiff in California, causing damages to Plaintiff in an amount to be determined at trial, which such harm Defendants knew likely to be suffered in California. Each of the Defendants purposefully benefitted from their activities in the forum state by such other facts as alleged further herein;

    ii.  the claims arise out of Defendants' forum-related activities, as alleged further herein;

    iii.  imposing personal jurisdiction is reasonable; and

    iv.  each of them is domiciled in, employed in, or has other contacts with this State such as to warrant a finding of personal jurisdiction.

40.  Venue in this district is proper under 15 U.S.C. § 22, 28 U.S.C. § 1391(b)(1), and Civil L.R. 3-2(c) and (e). Meta resides, transacts business, and is found in this district. The parties consented to venue here under Professional Services Agreement (Ex. 1).

**FIRST CAUSE OF ACTION**

**FIRST VIOLATION OF SHERMAN ACT, §1**

**AGAINST ALL DEFENDANTS**

41.  Plaintiff realleges and incorporates by reference all allegations in the Complaint.

42.  The Defendants, and each of them, did act or omit action, to conspire and collude, through mutual aiding-and-abetting and by acting in concert, or otherwise agreed, whether implicit, verbal, or written, to unreasonably restrain trade or commerce, in or affecting interstate commerce.

43.     In August 2023, each of the Defendants simultaneously cut off communication with Plaintiff, except for communications related to settlement of the claims which comprise the subject matter of this lawsuit.

44.     At such time, each of the Defendants had meetings and exchanged communications discussing and deciding together to cease working with Plaintiff and to terminate the contracts with Plaintiff without right, power, privilege, or justification.

45.     At such time, Alo, Thattil, and Trindall knew of and were aware that Plaintiff had entered into a deal with Pico to distribute the AEI Fitness App on the Pico VR App Store. They also knew that Plaintiff had just begun negotiating with Apple to distribute the AEI Fitness App on the Apple App Store. Pico and Apple are competitors of Meta in the VR Headset, App Development, VR App Distribution markets.

46.     At such time, Alo, Thattil, and Trindall communicated to Meta, Pruett, Dass, and Papaleo the substance and content of Plaintiff's negotiations with Pico and Apple.

47.     Therefrom, the Defendants, and each of them, entered into an agreement, whether implicit, verbal, or in writing, to terminate the contracts with Plaintiff and to cease doing business with Plaintiff in regards to the subject matter hereof. Further, the agreement was to, or would have the effect of, the AEI Fitness App not being distributed by the Pico VR App Store, not being distributed on the Apple VR App Store, not being usable on the Pico VR Headset, not being usable on the Apple VR Headset, and not being developed in competition with Meta VR App Development, such as in competition with the VR Fitness App owned by Meta called Supernatural.

48.     Meta and Alo simultaneously terminated their contracts with Plaintiff without right, power, privilege, or justification.

49.     Meta had a motive for entering into an anticompetitive agreement with Alo. Meta would profit by maintaining its monopoly over the markets for VR Headsets, VR App Distribution, VR App Development, VR Fitness Apps, and personal social networks.

50.     Alo had a motive for entering into the anticompetitive agreement with Meta. Alo could potentially suffer detriment if it did not comply with Meta. Meta has a monopoly over the

markets described herein, and has the ability to exclude Alo from the marketplace, as Meta has done for Plaintiff and countless other victims. Moreover, Alo could potentially profit by assisting Meta, because Meta is one of the largest technology businesses in the world.

51.     It did not make economic sense for Alo to enter into the anticompetitive agreement with Meta if Alo had been acting independently. This is because the app which Plaintiff was developing with Meta and Alo was on the verge of launch – after an entire year of development and expenses. When that app launches, Alo would not only reap revenues from the sales of the app, but Alo would also reap significant gains to its brand, which would support its other businesses (e.g. the sale of Yoga clothing). Moreover, the app would be immediately ported to other VR Headset devices: Apple and Pico, which would reap Alo even more revenues and brand gains.

52.     The agreement comprised, in part, an agreement of customer or market allocation to not compete amongst one another for customers in the VR Fitness App Market, or for certain groups of such customers, and/or to not compete amongst one another in the VR Fitness App Market, and/or for any future AEI Fitness App to be exclusively used on the Meta VR Headset, to be exclusively distributed on the Meta VR App Store, and/or to not compete with Meta VR App Development, which such agreement is per se illegal.

53.     The agreement comprised, in part, an agreement to restrict the production, output, or development of VR Fitness Apps in order to create an artificial scarcity which would, among other things, have one or more of the following effects: benefit Meta's VR Fitness App Supernatural by reducing competition in the VR Fitness App Market, strengthen Meta's monopoly over VR Headsets by disabling competitors such as Apple and Pico from having a leading VR Fitness App option, strengthen Meta's monopoly over VR App Distribution (the Meta VR App Store) by disabling competitors such as Apple and Pico from distributing a leading VR Fitness App, strengthen Meta's monopoly over VR App Development by "cutting off the knees" of a VR App Developer, and strengthen Meta's monopoly over personal social networks by disabling the AEI Fitness App from being launched on any other social platform in the future, which such agreement is per se illegal.

54.     The agreement comprised, in part, a concerted refusal to deal with Plaintiff, which such agreement is per se illegal.

55.     The relevant markets are the VR Headset Market, the VR App Store (VR App Distribution) Market, the VR App Development Market, the VR Fitness App Market, and the personal social networking market.

56.     Facebook has a monopoly in the relevant markets, as set out under the third cause of action below.

57.     The acts and omissions substantially and adversely affect interstate commerce by unreasonably restraining VR App Distribution interstate nationwide and internationally, by unreasonably restraining VR App Development interstate nationwide and internationally (Plaintiff develops VR apps interstate, not solely in California), by unreasonably restraining VR Headset sales interstate nationwide and internationally, by unreasonably restraining the VR Fitness App market interstate nationwide and internationally, and by unreasonably restraining the personal social media market interstate nationwide and internationally.

58.     Plaintiff was injured by not receiving payment of the sums due and to be due in the future, by being seized from distributing the AEI Fitness App on the Apple and Pico platforms, and other platforms, and the long-term losses incurred thereby, by being excluded from the VR Fitness App market, if not permanently, during its nascent development stages during which market share is captured, and the long-term losses incurred thereby, through significant and irreparable damage to its brand image and goodwill by Meta, the industry leader in VR, refusing to deal with Plaintiff, which is a VR Development company, and through other acts and omissions.

59.     The conduct of Defendants was a substantial factor in causing Plaintiff harm.

60.     As a direct and proximate result of the conduct, Plaintiff suffered damages.

61.     Plaintiff suffered damages in the amount of $100,000,000 (prior to three-folding).

62.     The aforementioned conduct by the specific Defendants, and each of them, was willful, oppressive, fraudulent, and malicious, and Plaintiff is therefore entitled to punitive damages.

63.     Plaintiff is entitled to an award of attorneys' fees upon prevailing in this action.

64.     Plaintiff is entitled to an award of costs upon prevailing in this action.

65.     Plaintiff is entitled to an award of prejudgment interest upon prevailing in this action.

**SECOND CAUSE OF ACTION**

**SECOND VIOLATION OF SHERMAN ACT, §1**

**AGAINST DEFENDANTS META, PRUETT, ZUCKERBERG, DASS, PAPALEO, AND INVADER**

1.     Plaintiff realleges and incorporates by reference all allegations in the Complaint.

2.     For the purposes of this second cause of action, the "Relevant Defendants" shall mean the Defendants set out above in the section title hereof.

3.     The Relevant Defendants, and each of them, did act or omit action, to conspire and collude, through mutual aiding-and-abetting and by acting in concert, or otherwise agreed, whether implicit, verbal, or written, to unreasonably restrain trade or commerce, in or affecting interstate commerce.

4.     From 2014 to present, the Relevant Defendants have performed under an agreement and/or engaged in activities whereby Defendant Meta would grant preferred access to Defendant Invader, a VR App Developer, above and beyond all other VR App Developers, to certain "essential facilities", the effect of which is that all other VR App Developers could not compete effectively without access to those "essential facilities". Such preferred treatment includes but is not limited to reduced review stringency to distribute an app on the Meta VR App Store. To use an analogy, this is like how a train station controls what trains may come and go. Such a case involving a train station and trains is indeed the fact pattern of the first case that enunciated the "essential facilities" doctrine. The preferred treatment also includes Meta providing Invader access to confidential information about the performance of other VR App Developers and other VR Fitness Apps.

5.      As part-and-parcel to, and in relation to such agreement, conspiracy, collusion, aiding-and-abetting, or action in concert between Meta and Invader, the Relevant Defendants agreed to exclude Plaintiff's VR Fitness App from the market.

6.      Meta and Invader were aware of the substance and content of Plaintiff's negotiations with Pico and Apple.

7.      Therefrom, the Relevant Defendants, and each of them, entered into an agreement, whether implicit, verbal, or in writing, to terminate the contracts with Plaintiff and to cease doing business with Plaintiff in regards to the subject matter hereof. Further, the agreement was to, or would have the effect of, the AEI Fitness App not being distributed by the Pico VR App Store, not being distributed on the Apple VR App Store, not being usable on the Pico VR Headset, not being usable on the Apple VR Headset, and not being developed in competition with Meta VR App Development, such as in competition with the VR Fitness App owned by Meta called Supernatural.

8.      Meta had a motive for entering into an anticompetitive agreement with Invader. Meta would profit by maintaining its monopoly over the markets for VR Headsets, VR App Distribution, VR App Development, VR Fitness Apps, and personal social networks.

9.      Invader had a motive for entering into an anticompetitive agreement with Meta. Invader would profit by receiving preferential treatment from Meta, and increased revenues as a result thereof.

10.     Meta and Invader maintain a blacklist of **"*don't feature*" and "*don't work with*"** VR App Developers that do not "do what they say", and by doing so Meta creates or maintains a monopoly over VR Fitness Apps, VR App Development, VR App Distribution, VR Headsets, and personal social networks. Meta and Invader put Plaintiff and its proprietor Andre Elijah on that blacklist.

11.     As one action of Meta in enforcing that blacklist, Meta singled-out and targeted Plaintiff, Andre Elijah, and Mike Dopsa by banning them from attending the largest VR conference in the world, Meta Connect 2023, without any justification. This action had the effect of removing, separating, and dissociating Plaintiff from the VR App Development market and

community, thereby reducing Meta's competition in that market. This action also had the effect of maintaining Meta's monopoly in VR Headsets, VR App Distribution, VR Fitness Apps, and personal social networking.

12.     The agreement comprised, in part, an agreement of customer or market allocation to not compete amongst one another for customers in the VR Fitness App Market, or for certain groups of such customers, and/or to not compete amongst one another in the VR Fitness App Market, and to not compete in the VR App Development Market, which such agreement is per se illegal.

13.     The agreement comprised, in part, an agreement to restrict the production, output, or development of VR Apps or VR Fitness Apps in order to create an artificial scarcity which would, among other things, have one or more of the following effects: benefit Meta's VR Fitness App Supernatural by reducing competition in the VR Fitness App Market, strengthen Meta's monopoly over VR Headsets by disabling competitors such as Apple and Pico from having a leading VR Fitness App option, strengthen Meta's monopoly over VR App Distribution (the App Store) by disabling competitors such as Apple and Pico from distributing a leading VR Fitness App, strengthen Meta's monopoly over VR App Development by "cutting off the knees" of a VR App Developer, and strengthen Meta's monopoly over personal social networks by disabling the AEI Fitness App from being launched on any other social platform in the future, which such agreement is per se illegal.

14.     The agreement comprised, in part, a concerted refusal to deal with Plaintiff, which such agreement is per se illegal.

15.     The relevant markets are the VR Headset Market, the VR App Store (VR App Distribution) Market, the VR App Development Market, the VR Fitness App Market, and the personal social networking market.

16.     Facebook has a monopoly in the relevant markets, as set out under the third cause of action below.

17.     The acts and omissions substantially and adversely affect interstate commerce by unreasonably restraining VR App Distribution interstate nationwide and internationally, by

unreasonably restraining VR App Development interstate nationwide and internationally

(Plaintiff develops VR apps interstate, not solely in California), by unreasonably restraining VR

Headset sales interstate nationwide and internationally, by unreasonably restraining the VR

Fitness App market interstate nationwide and internationally, and by unreasonably restraining the

personal social media market interstate nationwide and internationally.

18.     Plaintiff was injured by not receiving payment of the sums due and to be due in

the future, by being seized from distributing the AEI Fitness App on the Apple and Pico

platforms, and other platforms, and the long-term losses incurred thereby, by being excluded

from the VR Fitness App market, if not permanently, during its nascent development stages

during which market share is captured, and the long-term losses incurred thereby, through

significant and irreparable damage to its brand image and goodwill by Meta, the industry leader

in VR, refusing to deal with Plaintiff, which is a VR Development company, and through other

acts and omissions.

19.     The conduct of Relevant Defendants was a substantial factor in causing Plaintiff

harm.

20.     As a direct and proximate result of the conduct, Plaintiff suffered damages.

21.     Plaintiff suffered damages in the amount of $100,000,000 (prior to three-folding).

22.     The aforementioned conduct by the Relevant Defendants, and each of them, was

willful, oppressive, fraudulent, and malicious, and Plaintiff is therefore entitled to punitive

damages.

23.     Plaintiff is entitled to an award of attorneys' fees upon prevailing in this action.

24.     Plaintiff is entitled to an award of costs upon prevailing in this action.

25.     Plaintiff is entitled to an award of prejudgment interest upon prevailing in this

action.

### THIRD CAUSE OF ACTION

### VIOLATION OF SHERMAN ACT, §2

### AGAINST ALL DEFENDANTS

26.     Plaintiff realleges and incorporates by reference all allegations in the Complaint.

**14**

27.     Defendant Meta has monopoly power in the personal social network, VR Headset, VR App Distribution, VR App Development, and VR Fitness App markets in the United States.

28.     A global technology behemoth, Meta reaches into every corner of the world through its "Family of Apps"—Facebook, Instagram, Messenger, and WhatsApp—with more than three billion regular users. Seeking to expand its empire even further, Meta in recent years has set its sights on creating, and ultimately controlling, the VR "metaverse." One need look no further than the rebranding of the company from Facebook to "Meta" in 2021 to understand its vision—and its priorities—for the future. And Meta is serious about its goals: it has become the largest provider of VR devices and apps to customers in the United States.

29.     Facebook holds monopoly power in the market for personal social networking services ("personal social networking" or "personal social networking services") in the United States, which it enjoys primarily through its control of the largest and most profitable social network in the world, known internally at Facebook as "Facebook Blue," and to much of the world simply as "Facebook."

30.     In the United States, Facebook Blue has more than 240,000,000 monthly active users. No other social network of comparable scale exists in the United States.

31.     Facebook's unmatched position has provided it with staggering profits. Facebook monetizes its personal social networking monopoly principally by selling advertising, which exploits a rich set of data about users' activities, interests, and affiliations to target advertisements to users. Last year alone, Facebook generated revenues of more than $116.6 billion and profits of more than $23.1 billion.

32.     As Facebook has long recognized, its personal social networking monopoly is protected by high barriers to entry, including strong network effects. In particular, because a personal social network is generally more valuable to a user when more of that user's friends and family are already members, a new entrant faces significant difficulties in attracting a sufficient user base to compete with Facebook. Facebook's internal documents confirm that it is very difficult to win users with a social networking product built around a particular social "mechanic" (i.e., a particular way to connect and interact with others, such as photo-sharing) that

1   is already being used by an incumbent with dominant scale. Even an entrant with a "better"

2   product often cannot succeed against the overwhelming network effects enjoyed by a dominant

3   personal social network.

4        33.      In an effort to preserve its monopoly in the provision of personal social

5   networking, Facebook has, for many years, continued to engage in a course of anticompetitive

6   conduct with the aim of suppressing, neutralizing, and deterring serious competitive threats to

7   Facebook Blue.

8        34.      Meta's campaign to conquer VR began in 2014 when it acquired Oculus VR, Inc.,

9   a VR headset manufacturer. Since then, Meta's VR headsets have become the cornerstone of its

10  growth in the VR space: its last generation headset, the Meta Quest 2, is by far the most sold VR

11  Headset with a significant majority of headset sales in 2021 and 2022. Meta CEO Mark

12  Zuckerberg has publicly stated that Meta subsidizes its VR devices or sells them at cost in order

13  to attract users.

14       35.      And Meta's Quest Store (formerly Oculus Store) has become the top distribution

15  platform for VR software apps in the United States, connecting app developers and VR users in

16  an online marketplace through which developers can offer their products to users for download

17  onto their individual VR devices.

18       36.      Meta controls the wildly popular app Beat Saber, which it acquired by purchasing

19  Beat Games in November 2019. Beat Saber is the largest grossing VR App in the marketplace,

20  and Meta continues its development to today. Meta also controls the wildly popular app

21  Supernatural, which it acquired by purchasing Within in 2023. Supernatural is one of the most

22  used VR Apps in the marketplace, and both the Beat Saber App and the Supernatural Apps are

23  the leading VR Fitness Apps in the marketplace. In addition to these apps, Meta owns a number

24  of other VR apps, some of which it developed in-house but most of which it acquired by rolling

25  up other app studios.

26       37.      Meta has thus become a key player at each level of the VR ecosystem: in

27  hardware with its Meta Quest 2 headset, in app distribution with the Meta Quest App Store, and

28  in app development with Beat Saber, Supernatural, and several other popular titles, and in VR

1   Fitness Apps with Beat Saber, Supernatural, and other titles. This is not by accident; Meta has an

2   explicit strategy of buying and cloning leading apps and technology.

3        38.     As Meta fully recognizes, network effects on a digital platform can cause the

4   platform to become more powerful—and its rivals weaker and less able to seriously compete—

5   as it gains more users, content, and developers. The acquisition of new users, content, and

6   developers each feed into one another, creating a self-reinforcing cycle that entrenches the

7   company's early lead. This market dynamic can spur companies to compete harder in beneficial

8   ways by, for example, adding useful product features or hiring additional employees. But it can

9   also make anticompetitive strategies more attractive.

10        39.     Meta seeks to exploit the network-effects dynamic in VR. Indeed, Mr. Zuckerberg

11   has made clear that his aspiration for the VR space is control of the *entire* ecosystem. As early as

12   2015, Mr. Zuckerberg instructed key Facebook executives that his vision for "the next wave of

13   computing" was control of apps *and* the platform on which those apps were distributed, making

14   clear in an internal email to key Facebook executives that a key part of this strategy was for his

15   company to be "completely ubiquitous in killer apps"—i.e., in significant VR apps that prove the

16   value of the technology.

17        40.     The exclusion of the AEI Fitness App from the marketplace will empower Meta

18   to further control the entirety of the relevant markets.

19        41.     Accordingly, this exclusion of the AEI Fitness App eliminates both present and

20   future competition. That lessening of competition will result in reduced innovation, quality, and

21   choice, less pressure to compete for the most talented app developers, and potentially higher

22   prices for VR fitness apps. And Meta would be one step closer to its ultimate goal of owning the

23   entire "Metaverse."

24        42.     Defendant Meta has willfully maintained that power through improper means.

25        43.     Defendant Meta intentionally terminated its contracts with Plaintiff without right,

26   power, privilege, or justification.

27

28

44.     Meta had a motive for terminating the contracts with Plaintiff. Meta would profit by maintaining its monopoly over the markets for personal social networks, VR Headsets, VR App Distribution, and VR App Development.

45.     By such conduct, Defendant Meta intentionally excluded Plaintiff from the marketplace.

46.     Defendant Meta abused its market power by wrongfully terminating the contract and excluding the AEI Fitness App from the market thereby. VR app developers necessarily need to work with Meta to participate in the VR App Development market, and upstream to utilize the VR App Distribution and VR App Development markets.

47.     Meta's conduct has affected consumers by impairing competition in an unfairly restrictive way.

48.     Meta used its market power in some markets to obtain or maintain market power in other markets.

49.     Meta refused to deal with Plaintiff, a supplier, which such restriction was designed to exclude competition.

50.     Defendant Meta has willfully maintained that monopoly by improper means.

51.     Defendant Meta has attempted to monopolize the VR App Development and the VR Fitness App market by engaging in anticompetitive conduct with specific intent to monopolize and a dangerous probability of achieving monopoly power. In support thereof, Plaintiff realleges the facts set out under the first, second, and third cause of action herein, and the other facts delineated in the Complaint.

52.     Defendant Meta has conspired to monopolize the VR App Development and the VR Fitness App market with specific intent to acquire monopoly power and the ability to do so, and has taken over acts in pursuit of its goals. In support thereof, Plaintiff realleges the facts set out under the first and second causes of action herein, and the other facts delineated in the Complaint.

53.     The conduct of Defendants was a substantial factor in causing Plaintiff harm.

54.     As a direct and proximate result of the conduct, Plaintiff suffered damages.

1    55.    Plaintiff suffered damages in the amount of $100,000,000 (prior to three-folding).

2    56.    The aforementioned conduct by the specific Defendants, and each of them, was

3    willful, oppressive, fraudulent, and malicious, and Plaintiff is therefore entitled to punitive

4    damages.

5    57.    Plaintiff is entitled to an award of attorneys' fees upon prevailing in this action.

6    58.    Plaintiff is entitled to an award of costs upon prevailing in this action.

7    59.    Plaintiff is entitled to an award of prejudgment interest upon prevailing in this

8    action.

9                              **FOURTH CAUSE OF ACTION**

10                          **BREACH OF WRITTEN CONTRACT**

11                              **AGAINST DEFENDANT META**

12    60.    Plaintiff realleges and incorporates by reference all allegations in the Complaint.

13    61.    Plaintiff and Meta entered into the Professional Services Agreement (Ex. 1) and

14    the Statement of Work No. 2, a true and correct copy of which is attached as **Exhibit 2** (together,

15    the "**AEI Contracts**").

16    62.    Plaintiff did all, or substantially all, of the significant things that the contract

17    required it to do.

18    63.    Plaintiff was obligated to deliver the Deliverables (as defined in the AEI

19    Contracts) in accordance with the requirements of and by the delivery dates set out under the

20    Statement of Work No. 2, and as obliged under Article 2 of Statement of Work No. 2 and Article

21    3 of the Professional Services Agreement. The relevant Deliverables are specifically described in

22    Milestones 10-12 of Statement of Work No. 2.

23    64.    Plaintiff delivered the Deliverables under Milestones 10-12 as obligated.

24    65.    Defendant Meta did not do all or substantially all of the significant things that the

25    contract required it to do.

26    66.    Meta is obligated to pay for the delivery under Article 4 of the Professional

27    Services Agreement and for the sum set out Statement of Work No. 2, which such sum is

28    $1,500,000.

1     67.     Therefore, Meta owes Plaintiff $1,500,000 for the delivery.

2     68.     Meta has not paid for such, and is therefore in breach of the contract.

3     69.     Meta communicated to Plaintiff that it "rejected" Plaintiff's delivery of the
Deliverables. However, Meta did not have the right to do so outright, and in any event any such
right to accept or reject under the AEI Contracts is conditioned on the terms of the AEI
Contracts, which such terms Meta did not satisfy. In other words, Meta did not "reject"
Plaintiff's delivery under the terms of the AEI Contracts.

70.     Diving into this further, the AEI Contracts state that Meta may reject the
Deliverables where they "***do not comply*** with the applicable [Statement of Work]." Professional
Services Agreement (Ex. 1), Article 3.2 (emphasis added). Any such rejection must "in
writing… describe to [Plaintiff] ***in reasonable detail*** why the Deliverable was not Accepted."
Statement of Work No. 2 (Ex. 2), Article 5.1 (emphasis added). However, Meta ***did not*** reject the
Deliverables for non-compliance with the statement of work, and ***did not*** describe in reasonable
detail why the Deliverable was not accepted. Therefore, Meta cannot now stand on the ground
that it "rejected" the deliverables – because it did not.

71.     Moreover, acceptance or rejection must be given within "***thirty (30) days*** of…
Meta Tech's receipt of the Deliverables…." (Professional Services Agreement (Ex. 1), Article
3.2 (emphasis added). And in any case, Meta is required to "***use reasonable efforts*** to notify
[Plaintiff] in writing… ***within ten (10) business days*** after the expiration of the Test Period of
either its acceptance of the Deliverables… or… [rejection]." (Statement of Work No. 2 (Ex. 2),
Article 5.1 (emphasis added). However, such time periods have completely and utterly lapsed,
and Meta ***has not*** accepted the Deliverables or rejected them within such periods in a writing
with "reasonable detail" why the Deliverable was not accepted. Because of this, too, Meta does
not have any excuse for non-payment of the sums owed to Plaintiff.

72.     What's most telling about this case is that Plaintiff's counsel demanded and
requested several times that Defendant Meta give Plaintiff copies of such written notices of
rejection with "reasonable details". Defendant Meta refused to do so – and, reality evidences –
could not do so.

73.     It's also important to note that Plaintiff has several cure options under the AEI Contracts even if rejection were to occur – which it did not. Because of these cure periods, AEI had the right to cure for any defect, and would have still been owed the sums due under the AEI Contracts. However, Defendant Meta has refused to allow Plaintiff to cure under those cure periods, has outright denied Plaintiff the ability to perform such cure, and has insisted that the contract is "terminated".

74.     The AEI Contracts specifically contain an article entitled and called out as "Correction" – its title indicating that it allows for the Plaintiff to correct any defects in the Deliverable. That article goes on to explicitly give Plaintiff the right to cure or correct for any defects. The article states that "if Meta Tech notifies [Plaintiff] that the Deliverable is not Accepted, [Plaintiff] will then have a period of ten (10) calendar days following receipt of the notice… to modify the Deliverable [to cure defects reasonably detailed by Meta]." Professional Services Agreement (Ex. 1), Article 5.2.

75.     And it's not just that Plaintiff had the right to cure. It's much, much more. The contract goes on to state that Plaintiff has the right to cure *three separate times*. This broad and clear right gives the Plaintiff three completely separate attempts to cure for any defects. However, Plaintiff was never given the opportunity to cure for any defects because Defendant Meta never rejected the Deliverables with defects "reasonably detailed" in writing. Defendant Meta was required to do so three separate times – and did not do so.

76.     And even then – *even if* Meta had actually properly rejected the Deliverables *three separate times*, and even if Meta had given Plaintiff *three separate attempts* to cure – then Plaintiff has the right to *another thirty (30) day* cure period. However, neither did Meta give Plaintiff this additional required and obligated thirty (30) day cure period. Instead, Meta has refused to allow Plaintiff to cure under that cure period, has outright denied Plaintiff the ability to perform such cure, and has insisted that the contract is "terminated".

77.     This additional right to cure over a thirty (30) day period is delineated in Article 9.2 of the Professional Services Agreement. That article states that "Either party may terminate this SOW in the event the other party commits a material breach of this SOW that is not cured

1    within **thirty (30) days** of the receipt by the breaching party of written notice describing the

2    nature of the breach." Professional Services Agreement (Ex. 1), Article 9.2.

3          78.      Further Defendant Meta communicated, in attempt to underpay Plaintiff for his

4    works, that Plaintiff could not yet deliver Deliverables 11-12 because they were not yet due

5    under the AEI Contracts. However, this – too – is false. Defendant Meta requested that Plaintiff

6    begin work on such deliverables, and deliver them, and such agreement was memorialized in

7    writing.

8          79.      The breach of Defendant Meta was a substantial factor in causing Plaintiff harm.

9          80.      As a direct and proximate result of the conduct, Plaintiff suffered damages.

10         81.      Plaintiff was harmed by (1) non-receipt of the payment of the $1,500,000 sum, (2)

11    non-payment caused by wrongful anticipatory repudiation of $700,000 that becomes due to

12    Plaintiff under the AEI Contracts for the satisfaction of Milestones 13 and 16 of the Statement of

13    Works No. 2, (3) non-payment caused by wrongful anticipatory repudiation of $1,000,000 that

14    becomes due to Plaintiff under Article 7 of the Professional Services Agreement, (4) losses of

15    $25,000,000 which Plaintiff would receive under the Software Maintenance Agreement, a true

16    and correct copy of which is attached as **Exhibit 3** including, but not limited to, by means of

17    distributing the AEI Fitness App on the Meta VR App Store, Apple VR App Store, and Pico VR

18    App Store, (5) $25,000,000 in brand image and good will damage caused by Defendant's breach

19    and communications to third parties related thereto.

20         82.      The aforementioned conduct by the specific Defendants, and each of them, was

21    willful, oppressive, fraudulent, and malicious, and Plaintiff is therefore entitled to punitive

22    damages.

23                         **FIFTH CAUSE OF ACTION**

24                         **PROMISSORY ESTOPPEL**

25                           **AGAINST META**

26         83.      Plaintiff realleges and incorporates by reference all allegations in the Complaint.

27         84.      As set out above, Defendant Meta communicated, in attempt to underpay Plaintiff

28    for his works, that Plaintiff could not yet deliver Deliverables 11-12 because they were not yet

1   due under the AEI Contracts. As stated above, this is a false statement. Nonetheless, in the

2   alternative, if it were found to not be false, then Defendant Meta made a promise to Plaintiff that

3   if Plaintiff developed Deliverables 11-12 then they would be accepted at the end of August 2023,

4   and Plaintiff was induced by and relied on that promise by developing Deliverables 11-12,

5   Defendant should have reasonably expected the promise to induce action or forbearance because

6   it specifically included a request that Plaintiff immediately take action to develop the

7   Deliverables 11-12 because the parties agreed and intended to immediately launch the AEI

8   Fitness App after the end of August at an international annual VR conference held by Meta, and

9   for among other reasons, Plaintiff was damaged by such reliance in an amount to be determined

10  at trial, and injustice can be avoided only by enforcement of the promise.

11          85.     The conduct of Defendant Meta was a substantial factor in causing Plaintiff harm.

12          86.     As a direct and proximate result of the conduct, Plaintiff suffered damages.

13          87.     The aforementioned conduct by the specific Defendants, and each of them, was

14  willful, oppressive, fraudulent, and malicious, and Plaintiff is therefore entitled to punitive

15  damages.

16                              **SIXTH CAUSE OF ACTION**

17                              **QUANTUM MERUIT**

18                              **AGAINST META**

19          88.     Plaintiff realleges and incorporates by reference all allegations in the Complaint.

20          89.     Defendant Meta requested, by word and conduct, that Plaintiff perform services

21  for Defendant for the benefit of Defendant.

22          90.     Plaintiff performed the services as requested.

23          91.     Defendant has not paid for the services to the extent agreed upon.

24          92.     The reasonable value of the goods and services was $1,500,000.

25                              **SEVENTH CAUSE OF ACTION**

26          **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

27                              **AGAINST META AND ALO**

28          93.     Plaintiff realleges and incorporates by reference all allegations in the Complaint.

94.     There were contracts between Plaintiff and Meta, referred to herein as the AEI Contracts. There was a contract between Plaintiff and Alo, referred to herein as the Software Maintenance Agreement.

95.     Plaintiff performed under those contracts. Plaintiff did all, or substantially all, of the obligations that the contract required him to do, except those obligations that Plaintiff was prevented or excused from performing.

96.     Between July-October 2023, the Defendants' conduct prevented Plaintiff from receiving benefits under the contract. At such time, the Defendants negotiated separately from Plaintiff and without his consent, and agreed not to give Plaintiff what they had contracted to give him.

97.     By doing so, Defendants did not act fairly and in good faith.

98.     The conduct of Defendant Meta was a substantial factor in causing Plaintiff harm.

99.     As a direct and proximate result of the conduct, Plaintiff suffered damages.

100.    Plaintiff suffered damages in an amount to be determined at trial.

101.    The aforementioned conduct by the specific Defendants, and each of them, was willful, oppressive, fraudulent, and malicious, and Plaintiff is therefore entitled to punitive damages.

## EIGHTH CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH A CONTRACT

## AGAINST ALL DEFENDANTS

102.    Plaintiff realleges and incorporates by reference all allegations in the Complaint.

103.    There were contracts between Plaintiff and Meta, referred to herein as the AEI Contracts. There was a contract between Plaintiff and Alo, referred to herein as the Software Maintenance Agreement.

104.    Each of the Defendants knew of those contracts.

105.    Each of the Defendants' conduct prevented performance or made performance more expensive or difficult.

1    106.    Each of the Defendants' intended to disrupt the performance or knew that

2    disruption of performance was certain or substantially certain to occur.

3    107.    The conduct of Defendant Meta was a substantial factor in causing Plaintiff harm.

4    108.    As a direct and proximate result of the conduct, Plaintiff suffered damages.

5    109.    Plaintiff suffered damages in an amount to be determined at trial.

6    110.    The aforementioned conduct by the specific Defendants, and each of them, was

7    willful, oppressive, fraudulent, and malicious, and Plaintiff is therefore entitled to punitive

8    damages.

9                          **NINTH CAUSE OF ACTION**

10           **INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS**

11                           **AGAINST ALL DEFENDANTS**

12    111.    Plaintiff realleges and incorporates by reference all allegations in the Complaint.

13    112.    There were economic relationships between Plaintiff and Alo, Plaintiff and Meta,

14    Plaintiff and Pico, and Plaintiff and Apple.

15    113.    Each of the Defendants knew of those relationships.

16    114.    Each of the Defendants' conduct prevented performance or made performance

17    more expensive or difficult.

18    115.    Each of the Defendants' intended to disrupt the performance or knew that

19    disruption of performance was certain or substantially certain to occur.

20    116.    The relationships were disrupted.

21    117.    The conduct each of such Defendants was a substantial factor in causing Plaintiff

22    harm.

23    118.    As a direct and proximate result of the conduct, Plaintiff suffered damages.

24    119.    Plaintiff suffered damages in an amount to be determined at trial.

25    120.    The aforementioned conduct by the specific Defendants, and each of them, was

26    willful, oppressive, fraudulent, and malicious, and Plaintiff is therefore entitled to punitive

27    damages.

28                          **TENTH CAUSE OF ACTION**

**NEGLIGENT MISREPRESENTATION**

**AGAINST META**

121.    Plaintiff realleges and incorporates by reference all allegations in the Complaint.

122.    Defendant Meta represented to Plaintiff that Plaintiff may begin developing Deliverables 11-12 and would be compensated by doing so at the end of August 2023.

123.    Defendant knew, or should have known, that this information was false.

124.    Although Defendant may have believed that this representation was true, Defendant had no reasonable grounds for believing it was true when Defendant made it.

125.    Defendant intended that Plaintiff rely on that representation. Defendant specifically asked Plaintiff to develop Deliverables 11-12, and had several conversations with Plaintiff about such development.

126.    Plaintiff reasonably relied on that representation, and developed Deliverables 11-12.

127.    Plaintiff was harmed thereby.

128.    The misrepresentation of Defendant Meta was a substantial factor in causing Plaintiff harm.

129.    As a direct and proximate result of the conduct, Plaintiff suffered damages.

130.    Plaintiff suffered damages in an amount to be determined at trial.

131.    The aforementioned conduct by the specific Defendants, and each of them, was willful, oppressive, fraudulent, and malicious, and Plaintiff is therefore entitled to punitive damages.

**PRAYER**

     **WHEREFORE**, Plaintiff prays for judgment against Defendants declaring, ordering, and adjudging:

    1.      A judgment in favor of Plaintiff on all counts.

    2.      Defendants be ordered to pay to Plaintiff the Plaintiff's actual damages in the sum of $153,300,000 or such other amount as determined at trial, and any further damages resulting from Defendants' conduct as alleged herein.

    3.      That those damages for relevant counts be made threefold under 15 U.S.C. §4.

    4.      That the Defendants be made jointly and severally liable for the relevant damages. *See Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981).

    5.      Defendants be ordered to pay to Plaintiff the Plaintiff's reasonable attorneys' fees under 15 U.S.C. §4.

    6.      Defendants be ordered to pay to Plaintiff the Plaintiff's cost of suit under 15 U.S.C. §4.

    7.      Defendants be ordered to pay to Plaintiff special, exemplary, and/or punitive damages by reason of Defendants' willful, intentional, oppressive, and/or malicious conduct.

    8.      Pre-judgment interest at the legally allowable rate on all amounts owed.

    9.      Declaratory judgment that Defendant Meta breached the Professional Services Agreement.

    10.    Any equitable relief that this Court deems just and proper.

    11.    Any further relief that this Court deems just and proper.

    Dated: October 9th, 2023

                By: /s/ Joseph Prencipe
                    Joseph Prencipe (Bar No. 302787)
                    joe@optimistlegal.com
                    OPTIMIST LEGAL PC
                    f/k/a/ OMEED LAW PC
                    2219 MAIN ST #325
                    SANTA MONICA, CA 90405
                    Telephone: (310) 728-9994

**COMPLAINT**

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff demands trial by jury on all issues triable as a matter of right at law.

3

4

Dated: October 9th, 2023

5

By: /s/ Joseph Prencipe

6

Joseph Prencipe (Bar No. 302787)
joe@optimistlegal.com

7

OPTIMIST LEGAL PC
f/k/a/ OMEED LAW PC

8

2219 MAIN ST #325
SANTA MONICA, CA 90405

9

Telephone: (310) 728-9994

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I verify under penalty of perjury that the foregoing is true and correct.


Dated: October 9th, 2023

By: _____

CEO

Andre Elijah Immersive Inc.

**COMPLAINT**