# EXHIBIT 1

INB2651792



**PROFESSIONAL SERVICES AGREEMENT**

This Professional Services Agreement, including its exhibits and any amendments ("**Agreement**") and Statements of Work (each an "**SOW**") sets forth the terms and conditions under which **Andre Elijah Immersive Inc.** and/or its Affiliates with an office at 807 660 Briar Hill Ave., Toronto, Ontario, CANADA M6B 4B7 ("**Vendor**") is a service provider who will provide professional services ("**Services**") and Deliverables (as defined below) to **Meta Platforms Technologies LLC,** f/k/a Facebook Technologies, LLC with offices at 1 Hacker Way, Menlo Park, CA 94025 ("**Meta Tech**") and/or its Affiliates.  Vendor and Meta Tech are each a "**Party**" and together the "**Parties**" under this Agreement.  This Agreement is effective as of <u>August 16, 2022</u> ("**Effective Date**").

---

1. **CERTAIN DEFINITIONS.**

1.1 "**Affiliate**" means an entity which, directly or indirectly, owns or controls, is owned or is controlled by or is under common ownership or control of a Party. As used herein, "**control**" means the power to direct the management or affairs of an entity, and "ownership" means the beneficial ownership of fifty percent (50%) or more of the voting equity securities or other equivalent voting interests of the entity.

1.2 "**Background Technology**" means any proprietary methodologies, tools, models, software (including SDKs, APIs, development tools, engines and ad pixels), documentation, know-how, trade secrets, inventions, content, video, audio, sound effects, music, AR effects, trademarks, logos, works of authorship and other materials of any kind, in any form or format, conceived or developed independently by Vendor excluding the Deliverables and without the use of any Meta Tech Confidential Information, Meta Tech Information or any intellectual property owned or licensed to or by Meta Tech or its Affiliates.

1.3 "**Data Protection Legislation**" means any and all applicable data protection, security or privacy-related laws, statutes, directives or regulations, including but not limited to: (a) the Regulation (EU) 2016/679 (the "**GDPR**"), Directive 2002/58/EC and Directive 2009/136/EC together with any amending or replacement legislation, any EU Member State or United Kingdom laws and regulations promulgated thereunder, (b) the California Consumer Privacy Act of 2018 and the California Consumer Privacy Act Regulations (the "**CCPA**") together with any amending or replacement legislation, (c) Brazil's General Data Protection Law ("**LGPD**") together with any amending or replacement legislation, and (d) all other equivalent laws and regulations in any relevant jurisdiction relating to Personal Data and privacy, as each may be amended, extended or re-enacted from time to time.

1.4 "**Deliverables**" means any and all results of the Services, in any form or medium and regardless of the state of completion, developed and/or delivered by Vendor as further described in the applicable SOW.

1.5 "**Meta Tech Personal Data**" means Personal Data which is either (a) provided to Vendor by Meta Tech or otherwise accessed by Vendor or Vendor Parties in connection with this Agreement; or (b) collected or otherwise processed in any way by Vendor or Vendor Parties on behalf of Meta Tech in connection with the Services.

1.6 "**Meta Tech Information**" means any and all data and information received, stored, collected, derived, generated or otherwise obtained or accessed by Vendor or its Vendor Parties in connection with this Agreement, performance of the Services or, if applicable, access to any Meta Tech Properties, Sites (defined below) or any Systems (defined below) regarding any aspect of Meta Tech's or its Affiliates' business, including data or information provided by or on behalf of any Meta Tech user, advertiser, business partner or content provider, and other information such as system procedures, employment practices, finances, inventions, business methodologies, trade secrets, copyrightable and patentable subject matter.  Meta Tech Information does not include Personal Data.

1.7 "**Meta Tech Properties**" means the online properties, products, services, websites, widgets, applications and pages, including, without limitation, those accessible in whole or in part through any platform, medium or device, whether presently existing or later developed, that are developed in whole or in part by or for Meta Tech or its Affiliates throughout the world.

1.8 "**OSS**" means any and all open source software, community and other free code or libraries of any type, including, without limitation, any code which is made publicly available, without charge (*e.g.,* any code licensed under any version of the Artistic, BSD, Apache, Mozilla GNU, GPL, LGPL, GNU Affero GPL, the Affero GPL, the Academic Free License, the Common Development and Distribution License, the Common Public Attribution License, the Open Software License or any other license under which making software accessible to third parties through a network such as hosted or ASP services over the Internet is treated as a form of distribution) and any other code which may be combined with or linked to any of the foregoing code or which may impose any other obligation or restriction with respect to a Party's intellectual property rights.

1.9 "**Personal Data**" means information from or about an individual including, but not limited to: (a) a first or last name; (b) geolocation information sufficient to identify a street name and name of city or town; (c) an email address or other online contact information, such as an instant messaging user identifier or a screen name; (d) a mobile or other telephone number; (e) photos and videos; (f) Internet Protocol ("**IP**") address, user ID or other persistent identifier that can be used to recognize a user over time and across different devices, websites or online services; (g) a Social Security number; (h) a driver's license or other government issued identification number; (i) financial account number; (j) credit or debit information; (k) date of birth; (l) biometric information; (m) one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that natural person; (n) any user profile information

INB2651792

(i.e., information that a user adds to or is listed on a user's profile associated with any products or services offered by Meta Tech or its Affiliates), or user-generated content (e.g., status updates, photos), that is restricted by one or more privacy setting(s); (o) any information combined with any of (a) through (n) above; and/or (p) any information that otherwise is regarded as personal data or personal information under applicable laws and regulations.

1.10 "***Third Party Materials***" means any and all code, libraries, software (including SDKs, APIs, development tools, engines and ad pixels), datasets, OSS, technical information, products, content, video, audio, music, sound effects, AR effects trademarks, logos, equipment and other materials, in any form or format, that incorporate, make use of or are otherwise dependent upon any intellectual property of any type which is not created solely by Vendor.

1.11 "***Vendor Party***" or "***Vendor Parties***" means Vendor's employees, contractors, contingent workers, agents and subcontractors providing Services in connection with this Agreement.

2. **SCOPE.**

**2.1.** Scope.  Vendor and its Affiliates (as applicable) shall perform the Services and provide Deliverables in accordance with the terms of this Agreement and the requirements and deadlines set forth in the applicable SOW(s). Each SOW shall be substantially in the form attached at Exhibit A (Statement of Work) SOWs may be entered into by Meta Tech and Vendor; Meta Tech Affiliate and Vendor; Vendor Affiliate and Meta Tech; or Meta Tech Affiliate and Vendor Affiliate. Each SOW shall be deemed to be a stand-alone agreement that incorporates by reference the terms of this Agreement (*mutatis mutandis*) whereby each signing entity to the SOW shall be considered to be either "Meta Tech" or "Vendor" referenced herein (as applicable), and references to 'Party' and 'Parties' herein shall be construed accordingly). Vendor and any Vendor Affiliate which wishes to participate in this Agreement must complete Meta Tech's Vendor onboarding process prior to providing any Services.

**2.2.** Subcontracting and Vendor Parties.  All workers will be employed and paid as employees of Vendor and Vendor may not subcontract the Services (in whole or in part) to any Vendor Party without Meta Tech's prior written approval, which may be provided via email. Vendor will ensure that any Vendor Party (including subcontractors) it retains in connection with the performance of this Agreement, expressly agrees to all applicable Vendor obligations, compliance requirements, representations and warranties specified in the terms and conditions in this Agreement.  To the extent Vendor has received permission to subcontract Services to a Vendor Party, if such Vendor Party will interact with Government Officials, Vendor must also request and receive written approval from a Meta Tech Compliance employee.  Any such requests should be emailed to ComplianceDD@fb.com.  Prior to providing any Services, approved subcontractors may be required to complete and pass a third party security assessment.  Vendor will remain fully liable to Meta Tech for its and its Vendor Parties' compliance and performance of Vendor's obligations under this Agreement and any related SOW and will be responsible for all acts and omissions of its Vendor Parties.

3. **DELIVERY AND ACCEPTANCE.**

**3.1.** Delivery.  All Deliverables will be delivered electronically as instructed by Meta Tech or DAP Meta Tech's specified destination in accordance with Incoterms 2020, unless otherwise agreed in writing. Deliverables shall be delivered no later than the delivery date specified in the applicable SOW.  Title and risk of loss to tangible Deliverables will pass upon Meta Tech's inspection of the Deliverables at the Meta Tech destination.  Vendor will pay all duties, export fees, shipping costs and insurance, if any.

**3.2.** Acceptance.  Unless otherwise specified in the applicable SOW, Meta Tech will have thirty (30) days from Vendor's performance of the Services and/or Meta Tech's receipt of the Deliverables to accept or reject same.  If the Services or Deliverables do not comply with the applicable SOW, Meta Tech may reject same, and Vendor will correct and re-perform or re-deliver the Services and Deliverables within ten (10) days of Meta Tech's rejection.  If Vendor fails or is unable to furnish Services and Deliverables that comply with the applicable SOW within that period, Meta Tech will be relieved of any payment obligations associated with such Services and Deliverables and will be entitled to a refund of all fees and expenses already paid for same.

**3.3.** Trade Compliance.  Vendor shall be responsible for exporting and importing (including temporary imports), in accordance with the applicable Incoterm 2020, all Deliverables and Vendor Confidential Information required for performance of the Services.  Vendor will comply with all applicable export controls, import controls and trade sanctions applicable to the provision of commodities, software, technology or Services under this Agreement.  Vendor shall obtain, at its sole cost and expense, any export and import (temporary and permanent) license and other official authorization and carry out all required export and customs formalities. Vendor shall notify Meta Tech if Vendor will provide Deliverables or Vendor Confidential Information subject to the terms of an export license or authorization that contains conditions or restrictions on Meta Tech's use, transfer, sale, export or re-export of said items. Upon request, Vendor shall provide any requested export classification information.  Meta Tech may decline to receive goods, software, Services and/or technical data subject to U.S. or non-U.S. Trade Control Laws depending on the nature and level of the applicable controls.  In no event shall Vendor provide Deliverables controlled for export on a Munitions List.  Vendor represents and warrants that neither Vendor, nor Vendor Parties, are the target of sanctions imposed by the United States, United Kingdom, European Union or United Nations.  Vendor represents and warrants that these Services provided and/or activities conducted under this Agreement are not prohibited by applicable economic sanctions or trade restrictions.



INB2651792

4.   **PAYMENT.**

**4.1.** Payment and Taxes.  The fees quoted by Vendor shall be exclusive of taxes.  Subject to Section 3 (Delivery and Acceptance), Meta Tech will pay Vendor the fees specified in the applicable SOW in accordance with the terms of this Section 4 (Payments).  Vendor guarantees that the pricing in each SOW shall remain fixed during the term of the SOW.  Except as set forth in a SOW, Vendor will not be entitled to any other payments, reimbursements, royalties or consideration of any kind.  Vendor agrees that it will not commence any Services under any SOW until both Parties sign an SOW and Meta Tech issues a purchase order ("**PO**") corresponding to that SOW. Meta Tech is not responsible for any payment to Vendor if such conditions are not met. In no event will Meta Tech be responsible for any payment to any Vendor Parties.  Each Party shall be responsible for its own taxes that are imposed on it under applicable prevailing tax laws and regulations**.**  Meta Tech may deduct or withhold any taxes that Meta Tech determines it is legally obligated to deduct or withhold from any amounts payable to Vendor under the applicable SOW and the remaining amount will constitute full payment to Vendor of the amounts payable under the applicable SOW.

**4.2.** Expenses.  If specified in an SOW, Meta Tech will reimburse Vendor, at cost, for reasonable expenses incurred by Vendor in performing the Services, subject to Meta Tech's pre-approval and travel policy.

**4.3**   Invoices.  Vendor shall invoice Meta Tech monthly for time and material SOW(s), and for fixed price SOW(s), Vendor shall not invoice Meta Tech until Meta Tech's final acceptance of the Services and Deliverables, unless a different payment structure is set out in the applicable SOW.  Vendor will ensure that all invoices include the applicable PO number and be sent to the PO "Invoice To" address and Meta Tech shall not be liable to pay any invoice in the absence of such PO number or address.  Payments shall be made in U.S. Dollars, or the applicable local currency as set forth in the SOW, within thirty (30) days of receipt of an undisputed invoice.  Vendor shall include with all invoices a description of work performed as well as supporting documentation to substantiate fees invoiced for payments to third parties.  Meta Tech may require electronic invoicing and Vendor will timely comply with Meta Tech's written instructions for such electronic submission of invoices.  Prior to implementing electronic invoicing, Vendor shall submit invoices in writing to the address specified on the PO.

5.   **CONFIDENTIALITY.**

**5.1** Disclosures.  "**Confidential Information**" includes, without limitation, all technical and non-technical information provided by a party ("**Disclosing Party**") to the other party ("**Receiving Party**") that is either: (a) designated as confidential by the Disclosing Party at the time of disclosure; or (b) should reasonably be considered confidential, given the nature of the information or the circumstances surrounding its disclosure. Notwithstanding the above, all Meta Tech Information, Meta Tech Personal Data and all technical and non-technical information concerning or related to Meta Tech's and any of its Affiliates' products, services, online properties (including the discovery, invention, research, improvement, development, marketing or sale thereof), financial data and models, business and marketing plans and any information related to the foregoing constitutes the Confidential Information and property of Meta Tech (as it relates to this Agreement).  Notwithstanding anything to the contrary or any confidentiality marking, Background Technology and Third Party Materials shall be deemed Confidential Information except to the extent they are incorporated into a Deliverable.  The Receiving Party will not: (1) use any Confidential Information except for the sole benefit of the Disclosing Party and only to the extent necessary to provide the Services; or (2) disclose any Confidential Information of the Disclosing Party to any person or entity, except to those who are involved in performing this Agreement, have a need to know and have signed a non-disclosure agreement with terms no less restrictive than those herein.

**5.2** Exclusions.  Except for Meta Tech Information and Meta Tech Personal Data, Section 5.1 (Disclosures) will not apply to any information that: (a) is rightfully known by the Receiving Party prior to disclosure by the Disclosing Party; (b) is rightfully obtained by the Receiving Party from a third party without restrictions on disclosure; (c) is disclosed by the Receiving Party with the prior written approval of the Disclosing Party; or (d) to the extent required by law or court order so long as Receiving Party provides advance notice to the Disclosing Party as promptly as possible and cooperates with the Disclosing Party's efforts to obtain a protective order regarding such disclosure. Vendor warrants and represents all Vendor Parties have agreed in writing to be bound by confidentiality obligations no less restrictive than those contained in this Agreement.

**5.3** Return of Materials.  Promptly following the earlier of a request by the Disclosing Party or upon expiration or any termination of this Agreement or any SOW, the Receiving Party will promptly, securely and permanently destroy or (if requested) return the Disclosing Party's Confidential Information, Meta Tech Information and any Meta Tech Personal Data in its control and all copies thereof and provide the Disclosing Party with written confirmation of the same, provided that the Receiving Party may retain a single archival copy of Confidential Information if required to do so under applicable law.

**5.4** Publicity. Vendor agrees that it will not use Meta Tech's name, logo or trademarks or issue any public announcements or press releases, or confirm or comment on any information, public or otherwise, concerning Meta Tech or its Affiliates, their businesses or regarding this Agreement.  Notwithstanding the foregoing, Vendor may include Meta Tech's name and logo in Vendor's customer list (after approval and subject to Meta Tech's branding policy set forth at https://www.facebook.com/brand/meta/sub-brands but only to the extent and format it was approved to do so).  Vendor's rights to the aforementioned shall expire upon any expiration or termination of this Agreement, or upon written notice by Meta Tech, which may be given to Vendor at any time.



INB2651792

**5.5** <u>Feedback</u>.  Vendor agrees that Meta Tech or its Affiliates may develop information internally or receive information from other parties that may be similar to Vendor's Confidential Information. Nothing in this Agreement will prohibit Meta Tech or its Affiliates from developing (or having others develop) products, services or any other materials that compete with Vendor's products or services. Notwithstanding anything to the contrary, if Vendor provides any ideas, suggestions or recommendations to Meta Tech regarding Meta Tech's or any of its Affiliates' products and/or services or Meta Tech's Confidential Information ("***Feedback***"), Meta Tech and its Affiliates are free to retain, use, disclose and otherwise exploit, in any form or format and via any means whether now known or hereafter developed, including incorporating such Feedback in Meta Tech's and/or its Affiliates' products and/or services, without payment of royalties or other consideration to Vendor.

**6.**   **SECURITY AND PRIVACY.**

**6.1** <u>Site and System Access</u>.  If Vendor is granted access to any: (a) Meta Tech facility or location (each a "***Site***"); or (b) Meta Tech's systems, networks, databases, computers, telecommunications or other information systems owned, controlled or operated by or on their respective behalf (collectively "***Systems***"), then such access is subject to Vendor's and the Vendor Parties' compliance with all then-current Meta Tech policies. Any access to any Sites or Systems is strictly for the purpose of Vendor's performance of the Services during the Term.

**6.2** <u>Data Security and Privacy</u>.

**6.2.1** In the event that Vendor is provided with access to any Personal Information (defined in Exhibit B) including without limitation of or relating to any users, research participants, other vendors, or Meta Tech employees, then the data terms set out in <u>Exhibit B</u> (the "***Data Terms***") shall apply thereto.  Under the Data Terms, Vendor is deemed to be a Service Provider and Section 5.1 of the Data Terms does not apply to this Agreement.

**6.2.2**  Vendor warrants and represents that Vendor and its Vendor Parties: (a) will be required to perform necessary security clearances and, at a minimum, to the extent allowed by applicable law, all of the following background checks within the twelve (12) months immediately preceding the resource's first day of engagement with Meta Tech for any individuals performing Services: 1) social security trace (or local equivalent); 2) criminal (for all jurisdictions in which the resource has lived or worked for the past 7 years); and 3) Consolidated Government Screening List (i.e., Terrorist Watchlist); and (b) upon the termination of any resource's engagement, Vendor shall immediately notify Meta Tech.

**6.2.3** Vendor warrants and represents that Vendor and its Vendor Parties: (a) shall establish and maintain an environment that meets the highest standards of industry practice to safeguard Meta Tech Confidential Information, Meta Tech Information and Meta Tech Personal Data with the appropriate administrative, physical, organizational and technical safeguards that protect against the unauthorized or unlawful collection, destruction, loss, access, use, storage, alteration or disclosure of Meta Tech Information and Meta Tech Personal Data; (b) shall include an appropriate network security program (that includes, without limitation, encryption in storage and transit); (c) will not request, on Meta Tech's behalf, user passwords for any application, website or other services that are not controlled by Meta Tech and Meta Tech  will not use or disclose for the purpose of serving advertisements any telephone number within the Meta Tech Personal Data, unless expressly permitted by Meta Tech; (d) shall not, directly or indirectly, sell, rent, disclose, distribute, commercially exploit or transfer any Meta Tech Confidential Information, Meta Tech Information or Meta Tech Personal Data to any third party for any purpose whatsoever; (e) shall not collect, access, utilize, process, store, copy, modify, create derivative works of or disclose any Meta Tech Information or Meta Tech Personal Data except as specified in this Agreement or other documented instructions provided by Meta Tech; (f) only use, and retain the Meta Tech Information and meta Tech Personal Data solely for and at the direction of Meta Tech and for the purposes of providing the Services specified in the applicable SOW (the "***Purpose***"), and for no other individual or entity and for no other purpose, and (g) unless required by law, shall securely delete all Meta Tech Information and Meta Tech Personal Data as soon as the Services have been completed and are no longer needed for the Purpose.

**6.3** <u>Security Breach</u>. Vendor shall notify Meta Tech at <u>vendor-incident@fb.com</u> immediately (and in any event, (i) no later than forty-eight (48) hours or (ii) in accordance with the applicable Data Protection Legislation, whichever is shorter) following the discovery of any incident that involves or reasonably may involve the accidental or unlawful collection, destruction, unauthorized access to, use, alteration, disclosure, processing or loss of any Meta Tech Information or Meta Tech Personal Data or any other suspected breach or compromise of the security, confidentiality or integrity of any Meta Tech Information or Meta Tech Personal Data ("***Security Incident***"). Vendor shall provide to Meta Tech any and all information relating to such Security Incident and assistance Meta Tech requires to enable it to discharge its obligations under Data Protection Legislation including all information required to be notified to the supervisory authority pursuant to applicable Data Protection Legislation and resources and assistance as are required by Meta Tech in connection with such notification and for Meta Tech's notification to the relevant data subjects of such Security Incident, as applicable. Unless required by Data Protection Legislation, Vendor shall not notify or make any statement (or provide any documents) to any third party (including but not limited to the media, vendors, consumers, relevant regulators and supervisory authorities and individuals affected by a Security Incident) about such Security Incident and/or matters concerning any Meta Tech Information or Meta Tech Personal Data, without the prior written approval of Meta Tech. Where Vendor is legally required to make a statement (or provide any documents) without the approval of Meta Tech, Vendor shall promptly provide to Meta Tech a copy of any such statements or documents unless prohibited by applicable law.  Meta Tech may take enforcement action against Vendor, including but not limited to, limiting, suspending or terminating Vendor's access to all or any portion of meta Tech Personal Data or taking other action that may be reasonably necessary



INB2651792

to protect the privacy or security of Meta Tech Personal Data, if: (i) Meta Tech determines in its reasonable discretion that Vendor has violated this Agreement; and/or (ii) Vendor fails to reasonably cooperate with Meta Tech's reasonable request from time to time for information regarding Vendor's privacy and security practices.

7. **LICENSING.**  Vendor will not incorporate into or provide in conjunction with any Deliverable or create any Deliverable with a dependency upon any Background Technology or Third Party Materials without strictly complying with all of the conditions described in Section 9.1(e) below.  If Vendor incorporates into or provides in conjunction with any Deliverable, or creates any Deliverable with a dependency upon, any Background Technology or Third Party Materials, then Vendor hereby grants, at Vendor's sole cost and expense, Meta Tech (including Meta Tech's contractors, Affiliates and agents) a non-exclusive, royalty-free, fully paid up, irrevocable, worldwide, perpetual license (with the right to sublicense) to  make, have made, sell, offer for sale, use, execute, reproduce, modify, adapt, display, perform, distribute, make derivative works of, import, export and disclose the Background Technology and Third Party Materials in connection with the Deliverables, in any form or format and via any means whether now existing or developed in the future, and to permit others to do any of the foregoing.  All rights and licenses granted by Vendor are, and will otherwise be deemed to be, for purposes of Section 365(n) of the United States Bankruptcy Code, licenses to rights in "intellectual property."  The Parties agree that, in the event of commencement of bankruptcy proceedings by or against Vendor, Meta Tech will be entitled, at its option, to retain all of its rights under this Agreement pursuant to Code Section 365(n).

8. **OWNERSHIP.**

8.1 Ownership. To the fullest extent permitted by law and save in respect of Background Technology and Third Party Materials licensed to Meta Tech pursuant to Section 7 (Licensing), Meta Tech shall retain sole and exclusive ownership of all right, title and interest to all Deliverables, Meta Tech Properties, Confidential Information of Meta Tech (including Meta Tech Personal Data and Feedback), the Sites and Systems.  At no time will Vendor dispute or contest Meta Tech's exclusive ownership rights in any of the foregoing. Vendor shall retain sole and exclusive ownership of all right, title and interest to all Background Technology.

8.2 Deliverables. Subject to Section 7 (Licensing), all Deliverables and all intellectual property rights in the Deliverables will be the sole and exclusive property of Meta Tech and will be deemed to be a "work made for hire" (as defined in Section 101 of Title 17 of the United States Code).

8.3 Assignment.  If any Deliverable is determined not to be a "work made for hire," Vendor irrevocably and exclusively assigns, transfers and conveys to Meta Tech all right, title and interest (including all patent, copyright, trademark, trade secret and any other intellectual property right therein) in and to the Deliverable (without regard to whether any particular Deliverable has been accepted by Meta Tech). If Vendor has any rights to the Deliverables that cannot be assigned to Meta Tech, Vendor hereby unconditionally and irrevocably assigns the enforcement of such rights to Meta Tech and grants Meta Tech, its Affiliates, subcontractors, agents and assignees, an exclusive (even as to Vendor), irrevocable, perpetual, worldwide, fully paid up, royalty-free license to (with the right to sublicense) such Deliverables.  Vendor irrevocably appoints Meta Tech as its attorney-in-fact to verify and execute documents and to do all other lawfully permitted acts to effectuate Vendor's assignment of intellectual property rights in and to the Deliverables as required by this Section 8.3.  Vendor will obtain from the Vendor Parties any agreements necessary to comply with this Section 8.3.

9. **WARRANTY.**

9.1 Warranties.  Vendor represents and warrants that: (a) Vendor has full right and power to enter into and perform this Agreement and its performance under this Agreement will comply with all applicable laws and not conflict with any other obligation Vendor may have to any other party; (b) Vendor will perform the Services in a timely, professional and workmanlike manner and with a degree of quality equal to or higher than applicable industry standards; (c) all Services and Deliverables will conform to the applicable SOW; (d) Vendor maintains appropriate security measures to comply with the obligations in Section 6 (Security and Privacy) above and to ensure that any access it or Vendor Parties may have to Sites or Systems will not impair the integrity and availability of such Sites and Systems; (e) Vendor will not (i) incorporate any Background Technology or Third Party Materials into any Deliverables, or (ii) construct, create, design or otherwise build the Deliverables in such a way that requires Meta Tech to use Background Technology or Third Party Materials unless: (1) Vendor specifically identifies such Background Technology and/or Third Party Materials in the applicable SOW; (2) Vendor specifically identifies each OSS, if any, that Vendor intends to use and specified in an SOW; (3) all proposed use has been specifically preapproved by Meta Tech in writing; (4) Vendor procures, at its sole cost and expense, all rights necessary to grant Meta Tech the licenses in Section 7 (Licensing); and (5) Vendor ensures all such rights have been obtained and are granted in accordance with Section 7 (Licensing) above; (f) the Services and all Deliverables will be free of any: (i) viruses, worms, time bombs, Trojan horses or other harmful, malicious, destructive or undocumented code; and (ii) software disabling devices, time-out devices, counter devices and devices intended to collect data regarding usage or related statistics without the prior written authorization of Meta Tech; and (g) neither the Deliverables, nor any element thereof, will infringe the intellectual property rights of any third party or be subject to any restrictions or to any liens, security interests, encumbrances or encroachments.

9.2 Correction of Deliverables.  Vendor will, without charge, correct any non-conformity, defect or malfunction in any Deliverable within thirty (30) days of notice from Meta Tech. If Vendor is unable to correct the Deliverable within that thirty (30) day period, Vendor will do the following, as directed by Meta Tech, at Vendor's sole cost and expense: (a) procure the right for Meta Tech's continued use of the affected Deliverable; (b) replace the affected Deliverable; (c) modify the affected Deliverable to conform to Meta Tech's

INB2651792


requirements; or (d) refund Meta Tech all fees paid (and expenses incurred by Meta Tech) for the non-conforming Services and Deliverable.

**9.3** Disclaimer.  EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS AGREEMENT, EACH PARTY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**10.** **INDEMNITY.**  Vendor will indemnify, hold harmless and defend (in the case of subsections (d) and (e) below, upon Meta Tech's demand only) Meta Tech, its Affiliates and their respective officers, directors, employees, sublicensees, contractors, users and agents from any and all third party claims, losses, liabilities, damages, expenses, penalties, taxes and costs (including attorneys' fees and court costs) arising out of or related to: (a) any actual or alleged breach of any representation, warranty or other provision of this Agreement by Vendor or the Vendor Parties; (b) any actual or alleged infringement of any intellectual property rights by the Services, Deliverables or use of either; (c) negligent, willful or reckless acts or omissions, dishonesty or fraud of or by Vendor, its agents, employees or representatives; (d) any claim that an individual within the Vendor or Vendor Parties (i) has been unfairly or unlawfully dismissed; or (ii) is or was an employee of Meta Tech, was otherwise engaged directly by Meta Tech or is owed any redundancy payment; (e) any legal requirement to make any employment-related deduction of, or payment for, any taxes and levies for or relating to any Vendor or Vendor Parties; (f) a breach of Section 6 (Security and Privacy), Section 14.12 (Compliance with Laws) or Section 14.6 (Anti-Corruption); and (g) any personal injury, bodily injury, advertising injury or property damage caused by the negligence, acts or omissions of Vendor or any Vendor Party (each a "**_Claim_**"). Meta Tech shall give prompt written notice of a Claim and Meta Tech has the right (but no obligation) to participate in the defense of such Claim at its expense.  In no event will Vendor settle any Claim without Meta Tech's prior written consent, not to be unreasonably delayed.

**11.** **LIABILITY.**   EXCEPT FOR INFRINGEMENT OF META TECH'S INTELLECTUAL PROPERTY RIGHTS, BREACH OF SECTION 5 (CONFIDENTIALITY), BREACH OF SECTION 6 (SECURITY AND PRIVACY), VENDOR'S INDEMNITY OBLIGATIONS UNDER SECTION 10 (INDEMNITY), BREACH OF SECTION 14.12 (COMPLIANCE WITH LAWS) OR BREACH OF SECTION 14.6 (ANTI-CORRUPTION): (A) NEITHER PARTY WILL BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES, REGARDLESS OF THE FORM OF ACTION WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; AND (B) EACH PARTY'S MAXIMUM AGGREGATE LIABILITY UNDER THIS AGREEMENT SHALL BE LIMITED TO THE GREATER OF THE TOTAL AMOUNTS PAID BY META TECH TO VENDOR DURING THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE CLAIM; OR ONE MILLION DOLLARS ($1,000,000).  THE PARTIES AGREE THAT THE ABOVE PROVISIONS FAIRLY ALLOCATE THE PARTIES' RISKS AND ARE ESSENTIAL ELEMENTS OF THE BASIS OF THE BARGAIN UNDER THIS AGREEMENT.

**12.** **TERM AND TERMINATION.**

**12.1** Term.  The term of this Agreement will begin on the Effective Date and continue for a period of one (1) year, automatically renewing thereafter for additional one (1) year periods, unless terminated earlier as per this Section 12 (Term and Termination).  The initial term and all renewal terms are collectively referred to as the "**_Term_**."

**12.2** Termination.  Except as specified in Section 14.6 (Anti-Corruption), Meta Tech may terminate this Agreement or any SOW at any time and for any or no reason upon giving ten (10) days' prior written notice to Vendor.  Any termination of a SOW shall not result in termination of any other SOW(s) or this Agreement.  However, any termination of this Agreement shall result in termination of all then-pending SOW(s). In addition, either Party may terminate this Agreement if the other Party to this Agreement: (a) fails to cure any breach of this Agreement within thirty (30) days of the non-breaching Party's written notice of such breach; (b) ceases to do business in the ordinary course; or (c) seeks protection under any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding, or if any such proceeding is instituted against such Party (and not dismissed within sixty (60) days).

**12.3** Transition.  Unless otherwise instructed by Meta Tech, upon expiration or termination of this Agreement or any SOW(s), Vendor will: (a) continue to provide Services and Deliverables to Meta Tech until the effective date of such expiration or termination; (b) furnish any and all Deliverables to Meta Tech in the format required by Meta Tech, regardless of the state of completion, and (c) if reasonably requested by Meta Tech, cooperate in good faith to transition the Services to Meta Tech's other vendor(s).

**12.4** Effect of Termination.  Section 1 (Definitions), Section 2.2 (Subcontracting and Vendor Parties), Section 3.3 (Trade Compliance), Section 5 (Confidentiality), Section 6 (Security and Privacy), Section 7 (Licensing), Section 8 (Ownership), Section 9 (Warranty), Section 10 (Indemnity), Section 11 (Liability), Section 12.4 (Effect of Termination), Section 13 (Records) and Section 14 (General) will survive the termination or expiration of this Agreement. If Meta Tech terminates a SOW other than pursuant to Section 12.2(a), Meta Tech will pay Vendor the undisputed fees due subject to Section 4 (Payment).  Notwithstanding anything to the contrary in this Agreement, Vendor's obligations regarding Meta Tech Personal Data will survive any termination or expiration of this Agreement to the extent Vendor continues to retain or otherwise process Meta Tech Personal Data (as such retention or processing may be permitted under the Agreement or applicable law).

**13.** **RECORDS.**  Upon reasonable prior notice, Meta Tech (or its professional advisors or representatives) may inspect Vendor's records (no more than once per year unless required by law or court order or have failed a prior audit) solely to the extent necessary to verify Vendor's compliance with this Agreement. Vendor and Vendor Parties will provide Meta Tech with access to, and any assistance and

INB2651792

information that Meta Tech may require with respect to, Vendor, Vendor Parties and their systems, networks, computers and procedures related to the Services as necessary to enable Meta Tech to audit and confirm compliance with the provisions of the Agreement and applicable laws. Vendor and Vendor Parties will provide Meta Tech with the assistance reasonably required to enable Meta Tech auditors to verify the security, privacy and integrity of Meta Tech Information and Meta Tech Personal Data. Vendor will keep and maintain complete and accurate records in connection with its performance of the Services and all fees charged to Meta Tech and will retain these records for at least three (3) years after final payment for the Services, however such retention shall not include Meta Tech Information, Meta Tech Personal Data or Meta Tech Confidential Information. Meta Tech will bear the full cost and expense of any audit performed by Meta Tech, unless such audit discloses Vendor's breach of this Agreement, in which case Vendor will bear the full cost and expense of such audit. If Vendor is notified that any audit indicates that Vendor or a Vendor Party is not in compliance with any terms of this Agreement, then Vendor will, and will cause Vendor Parties to, promptly correct such problem at Vendor's sole expense. Notwithstanding anything to the contrary in this Agreement, Meta Tech may retain any documentation necessary to demonstrate compliance with its legal obligations for at least five (5) years following receipt.

## 14. GENERAL.

**14.1** <u>Independent Contractors</u>. Vendor and the Vendor Parties are independent contractors and not employees, partners, agents or joint venturers with Meta Tech. Vendor will be solely responsible for all acts, obligations and payments due with respect to Vendor Parties. Vendor, and not Meta Tech, will be responsible for the hiring, management, supervision, discipline, control, performance and all other employment related requirements of the Vendor Parties. Neither Party will have the power to bind the other or incur obligations on the other Party's behalf without the other Party's prior written consent.

**14.2** <u>Assignment</u>. Neither Party may assign this Agreement or any of its rights or obligations hereunder without the prior written consent of the other Party and any attempt to do so will be null and void. To the extent Meta Tech consents to any assignment by Vendor to a third party or subsidiary of Vendor, in no event will Vendor transfer any Meta Tech Information or Meta Tech Personal Data without the prior written consent of Meta Tech to each specific transfer of Meta Tech Information or Meta Tech Personal Data. Notwithstanding anything to the contrary in this Agreement, Meta Tech may assign this Agreement to: (i) any of its Affiliates; or (ii) any entity in connection with a reorganization, merger, consolidation, acquisition or other transaction involving all or substantially all of the voting securities or assets of Meta Tech, upon written notice to Vendor. Subject to the foregoing limitation on assignment, the Agreement will be binding upon, enforceable by and inure to the benefit of the Parties and each of their successors and permitted assigns.

**14.3** <u>Governing Law</u>. This Agreement will be governed and construed under the laws of the State of California without regard to conflicts of law provisions. Any suit or proceeding arising out of or relating to this Agreement will be brought in the federal courts in San Francisco, California and state courts in San Mateo County, California, as applicable, and each Party irrevocably submits to the jurisdiction and venue of such courts.

**14.4** <u>Affordable Care Act</u>. Vendor shall treat all Assigned Workers as its common-law employees under the Affordable Care Act ("***ACA***") and Vendor shall comply with all applicable provisions of the ACA. In any month in which an Assigned Worker provides Services, Vendor shall offer the Assigned Worker "Minimum Essential Coverage" that is "Affordable" and "Minimum Value," as each of those terms are defined by the ACA. "***Assigned Worker***" shall mean any Vendor resource assigned to perform work for Meta Tech in the United States and who is provisioned with access to Meta Tech Sites or Systems.

**14.5** <u>Nondiscrimination</u>. Meta Platforms, Inc., the parent of Meta Tech, is a federal contractor and maintains an equal opportunity/affirmative action program in accordance with applicable law. As a result, Vendor must, in accordance with applicable law, afford equal employment opportunity to all of its applicants and employees, regardless of their race, color, national origin, sex, age, religion, marital status, sexual orientation, gender identity and gender expression, protected veteran status, disability or other basis protected by law. As a result, but only if applicable, Vendor shall abide by the requirements of 41 CFR 60–1.4(a), 60–300.5(a) and 60–741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability or veteran status.

**14.6** <u>Anti-Corruption</u>. Vendor, on behalf of itself and Vendor Parties, represents and warrants that it has complied and shall comply with all applicable laws, rules and regulations relating to anti-bribery and corruption and that it has used and shall use only legitimate and ethical business practices; and shall refrain from offering, promising, paying, giving, authorizing the paying or giving of, soliciting or accepting money or anything of value (including facilitation of payments), discounts, rebates, gifts, use of materials, facilities or equipment, entertainment, hospitality, drinks, meals, transportation, lodging or promise of future employment, directly or indirectly, to or from (a) any Government Official to (i) influence any act or decision of a Government Official in his or her official capacity, (ii) induce a Government Official to use his or her influence with a government or instrumentality thereof, or (iii) otherwise secure any improper advantage; or (b) any person in any manner that would constitute bribery or an illegal kickback, or would otherwise violate applicable anti-corruption law. "***Government Official***" means any official or employee of (1) any national, regional or local government in any country, (2) any government-owned or -controlled enterprise; (3) any public educational, scientific or research institution; (4) a political party; (5) any candidate (including the candidate) for public office; (6) a public international organization; and any person acting on



INB2651792

behalf of or any relatives, family or household members of any of those listed above.   Meta Tech may immediately terminate this Agreement if Vendor fails to comply with this Section 14.6 (Anti-Corruption).

**14.7** Accessibility. Vendor will ensure that the Services are compliant and will remain compliant, with the accessibility standards of WCAG2.0 AA for Internet-based technology.  Vendor will address any complaints or concerns regarding the accessibility of its Services in a prompt manner, but within no more than ninety (90) days after Vendor is provided with such notice. Meta Tech reserves the right to request from Vendor a timeline for the remediation of accessibility concerns.

**14.9** RBA. Vendor will (and will cause each Vendor Party to) comply with the standards on social, environmental and ethical issues set forth in the Responsible Business Alliance ("**RBA**") Code of Conduct. The obligations of Vendor with respect to its compliance with the RBA Code of Conduct will be in addition to all of Vendor's obligations in this Agreement.

**14.10**  Insurance.  Vendor, at its sole cost and expense, will maintain adequate insurance. Vendor's insurance coverage, however, will not limit Vendor's liability under this Agreement.

**14.11**  Notices.  Any notice hereunder will be in writing to the address set forth above (and in the case of Meta Tech, to Legal-Notices@fb.com, attention: Meta Tech Legal and in the case of a Security Incident, shall also include vendor-incident@fb.com) and will be deemed given: (i) upon receipt if by personal delivery; (ii) upon receipt if sent by certified or registered mail (return receipt requested); or (iii) one (1) day after it is sent if by next day delivery by a major commercial delivery service or by electronic mail. If Vendor becomes aware that any violation of the terms of Section 2.2 (Subcontracting and Vendor Parties), Section 3.3 (Trade Compliance) or Section 14.6 (Anti-corruption) has occurred, is threatened or has been requested by any person or entity (including by an employee or representative of Meta Tech), it shall provide prompt notice to Meta Tech of the facts and circumstances associated with such violation or request.

**14.12**  Compliance with Laws. Vendor's and Vendor Parties' performance under this Agreement will be in compliance with all applicable international, federal, state, county and local laws, executive orders, government rules and regulations.  Vendor will comply with 1) all provisions of applicable laws pertaining to the privacy and security of Meta Tech Information, Personal Data, Meta Tech Personal Data and Meta Tech Confidential Information, including but not limited to Data Protection Legislation; and 2) all Meta Tech policies.

**14.13**  No Contact.  At no time shall Vendor use Meta Tech's email addresses to directly or indirectly contact Meta Tech's personnel (except for communication with Meta Tech's personnel who are directly managing the Services) or to provide any type of or advertising to Meta Tech's personnel.

**14.14**  Entire Agreement.  This Agreement is the entire agreement of the Parties and supersedes all previous or contemporaneous agreements between the Parties relating to its subject matter.  If the terms of any SOW conflict with the terms of this Agreement, the terms of the applicable SOW will prevail as to the pricing, delivery dates and description of the applicable Services and Deliverables but will not prevail over, modify or terminate any surviving provision of this Agreement. This Agreement or any SOW may only be modified by an amendment signed by the Parties.

**14.15**  Waiver and Severability.  No provision of this Agreement will be waived by any act, omission or knowledge of a Party or its agents or employees except specifically in a writing signed by the waiving Party.  If any provision is deemed by a court unenforceable or invalid, that provision will be stricken or modified, and the remainder of this Agreement will be in full force and effect.

**14.16**  Counterparts.  This Agreement, including its SOWs, may be executed by way of electronic signature in counterparts including PDF and other electronic copies, each of which will be deemed an original and together will constitute the same instrument.

WITH INTENT TO BE BOUND, Vendor and Meta Tech, by signature of their authorized representatives, have executed this Agreement as of the Effective Date.

| Accepted and agreed to by: | Accepted and agreed to by: |
|---|---|
| **Andre Elijah Immersive Inc.** | **Meta Platforms Technologies, LLC for itself and for the benefit of each of its Affiliates** |
| Signature: *Andre Elijah*<br>Andre Elijah (Aug 23, 2022 17:23 EDT) | Signature: *Tamara Sciamanna*<br>Tamara Sciamanna (Aug 23, 2022 14:25 PDT) |
| Name: Andre Elijah | Name: Tamara Sciamanna |
| Title: Founder | Title: Authorized Representative |

INB2651792



**EXHIBIT A**
==SAMPLE ONLY – NOT FOR SIGNATURE==

**Statement of Work for** *Enter SOW Name*

*No services may be performed until Meta Tech and Vendor sign this statement of work <u>and</u> Meta Tech issues a valid purchase order*

The purpose of this SOW is to describe the Services and Deliverables that Vendor will provide to Meta Tech under the terms of the Professional Services Agreement entered into between **[insert vendor name (bold)]** ("*Vendor*") and **Meta Platforms Technologies, LLC** f/k/a Facebook Technologies, LLC ("*Meta Tech*") on [Insert effective date (underline)] (the "*Agreement*"). Capitalized terms used and not defined in this SOW have the meanings given such terms in the Agreement.

This SOW is effective as of [Enter SOW Start Date (underline)] ("**SOW Effective Date**"). Unless otherwise terminated earlier in accordance with the terms of the Agreement, the Services and Deliverables will end on the completion of the Services and Deliverables by Vendor, which in no event shall be later than [Enter SOW End Date (underline)] unless mutually agreed to by the parties in writing or in email, and acceptance of the Services and Deliverables by META TECH.

| Vendor | Meta Tech |
|---|---|
| Project Manager: | Project Manager: |
| Email: | Email: |

1. **Services**. Vendor shall provide the following Services to Meta Tech:
   1.1 <u>Description</u>: *Describe the Services to be provided by Vendor under this SOW*

   1.2 <u>Services Location</u>. Meta Tech's __ facilities will be available for Vendor to perform the Services, subject to Vendor's compliance with the terms of the Agreement and all applicable Meta Tech policies. *or At Vendor's facilities. Select one of the two options.*

2. **Deliverables**. Vendor will deliver the following Deliverables, which will meet the requirements set forth below:
   2.1 <u>General Description of Deliverables</u>:
   The results of the Services, including but not limited to the following: __ *Remove this sentence if no specific Deliverables are identified.*

   2.2 <u>Description of Documentation for Deliverables</u>: Any reports, summaries, manuals, guides or other documentation provided to Meta Tech by Vendor. The Documentation shall include but is not limited to the following:

   **IMPORTANT NOTE**: Vendor will not incorporate into or provide in conjunction with any Deliverable or create any Deliverable with a dependency upon any Background Technology or Third Party Materials without strictly complying with all of the conditions described in <u>Section 9.1(e)</u> of the Agreement.

   2.3 <u>Background Technology (if any)</u>: Are any Background Technologies incorporated into or provided in conjunction with any Deliverable or is any Deliverable dependent on any Background Technology?     Yes ☐ No ☒
   *IF YES, SPECIFICALLY DESCRIBE ALL BACKGROUND TECHNOLOGY.*

   2.4 <u>Third Party Materials (if any)</u>: Are any Third Party Materials incorporated into or provided in conjunction with any Deliverable or is any Deliverable dependent on any Third Party Materials?     Yes ☐ No ☒
   *IF YES, SPECIFICALLY DESCRIBE ALL THIRD PARTY MATERIALS.*

   **IMPORTANT NOTE**: For any and all Open Source Software ("**OSS**") specified in Section 2.4, provide a link to the applicable license.

   2.5 <u>Code Review</u>: All code submitted by Vendor will be subject to Meta Tech code review as appropriate and in accordance with Meta Tech policies.

3. **Performance**.
   3.1 <u>Reports</u>. If requested, Vendor will provide written reports to Meta Tech documenting Vendor's performance of the Services.

   3.2 <u>Meta Tech Resources</u>. Subject to the Agreement, Meta Tech may make resources available to Vendor, provided however, that any and all property and assets, whether tangible or intangible, provided by Meta Tech to Vendor shall remain Meta Tech property. The resources shall include but are not limited to the following: __ *Remove this sentence if sentence if no specific resources are identified.*

4. **Timeline**. The Services will be performed and Deliverables created in accordance with the timeline specified __. *If none are provided, use "above".*



INB2651792

**5.   Acceptance.**  The Services and Deliverables will conform to the following requirements: *Provide a <u>detailed</u> description of the requirements for the Services or Deliverable.  If no requirements are specified, use the following sentence:* The Services and Deliverables will conform to the description and requirements set forth in Sections 1 and 2 above, and require written acceptance from the Meta Tech Project Manager.

**6.   Fees**.

6.1   <u>Delivery and Invoice Schedule</u>.   Delivery and invoice for Services and Deliverables shall be as follows:

☒   **Deliverable basis as follows:** Vendor shall perform the Services for the fixed amount specified below.

| Deliverable(s) | Estimated Due Date | Amount Payable Upon Written Acceptance of the Deliverable |
|---|---|---|
|  |  |  |
|  |  |  |
| **Maximum Authorized Fees Up to and Not to Exceed** |  |  |

[OR]

☒   **Time and material basis as follows:** Vendor will provide the Services on a time and materials basis based on the applicable rates as set forth below. Vendor will invoice Oculus within fifteen (15) business days of the first day of each month for the hours actually spent providing Services during the preceding month.

| Resources | Estimated Start Date | Estimated End Date | Estimated Hours | Hourly Rate | Maximum Authorized Fees |
|---|---|---|---|---|---|
| Resource Title, Name: | ? | ? | ? | ? | ? |

6.2   <u>Expenses</u>.   Subject to the Agreement and Attachment A, the following expenses may be eligible for reimbursement under this SOW: Enter an amount below if expenses are specified [or] None [or for some fixed price] Included in the amount specified above.

| **Maximum Authorized Expenses** | Up to and not to exceed: 0.00 |
|---|---|

6.3   <u>Up To and Not to Exceed Figure</u>.   All fees, costs and expenses for all Services and Deliverables under this SOW shall be up to and not to exceed the "Maximum Amount" below, which is the combined total of the Maximum Authorized Fees and the Maximum Authorized Expenses.  Meta Tech's maximum liability for all Services under this SOW shall not exceed the amount of the Purchase Order(s) issued referencing this SOW.

| **Maximum Amount** | Up to and not to exceed: __ |
|---|---|

**7.   Special Instructions**: None

| Accepted and agreed to by:<br>**[insert vendor name (bold)]** | Accepted and agreed to by:<br>**Meta Platforms Technologies, LLC** |
|---|---|
| Signature:  *Sample Only - Not for signature* | Signature:  *Sample Only - Not for signature* |
| Name:  _____ | Name:  _____ |
| Title:  _____ | Title:  _____ |



INB2651792

**EXHIBIT B**
*Data Terms*

The following data terms shall apply pursuant to Section 6.2.1 of the Agreement above:

These terms Data Terms apply to any and all Personal Information (defined below) that Vendor accesses, receives, and/or obtains from or on behalf of Meta Tech in connection with the above Agreement ("***Meta Tech Data***").

1. <u>Certain Definitions.</u>

1.1 "***Applicable Law***" means any law, regulation, and/or court order applicable to Meta Tech Data.

1.2 "***Meta Tech Terms***" means policies, terms, and procedures that apply to Vendor and that relate to the privacy, confidentiality, and integrity (e.g., unauthorized destruction, corruption, and/or falsification) of Meta Tech Data.

1.3 "***Personal Information***" means any information from, about, or that can be associated with any household, individual consumer, or other individual, including any Meta Tech users, employees, and contingent workers, or that otherwise is regarded as personal data or personal information under Applicable Law.

2. <u>Applicability.</u> These Data Terms independently apply to and supplement the Agreement and any SOW that Vendor enters into with Meta Platforms Technologies, LLC and/or any of its affiliates (collectively "***Meta***"). With respect to the Agreement and any SOW thereunder, Vendor is a "***Service Provider***" and/or "***Third Party***" hereunder to the extent identified as such in or under the Agreement. To the extent Vendor is not expressly identified as a "Service Provider" in or under the Agreement, Vendor is a "Third Party" hereunder.

3. <u>General Safeguards.</u>

3.1 Vendor will: (i) comply with Applicable Law in connection with its processing (including disclosure) of Meta Tech Data; (ii) maintain reasonable technical, organizational, and physical data security safeguards to protect Meta Tech Data; (iii) encrypt in storage and transit any Meta Tech Data that Vendor knows or should reasonably know consists of user passwords and will not request, on Meta Tech's behalf, user passwords for any application, website, or other services that are not controlled by Meta Tech; (iv) not use or disclose for the purpose of serving advertisements any telephone number of a Meta Tech user contained within the Meta Tech Data, unless expressly permitted by Meta Tech; (v) provide notice to Meta Tech at vendor-incident@fb.com promptly following Vendor's discovery of any unauthorized or unlawful processing (including access or disclosure) of Meta Tech Data; and (vi) reasonably cooperate with Meta Tech's reasonable request from time to time for information regarding Vendor's privacy and security practices.

3.2 If Meta Tech determines in its reasonable discretion that Vendor has violated the Meta Tech Terms, then Meta Tech may take enforcement action against Vendor by limiting, suspending, or terminating Vendor's access to Meta Tech Data or taking other action that may be reasonably necessary to protect the privacy or security of Meta Tech Data.

3.3 Notwithstanding anything to the contrary in the Agreement, Meta Tech may retain any documentation necessary to demonstrate its compliance with Applicable Law for at least five (5) years following receipt, unless other legal or regulatory obligations impose a longer retention period.

4. <u>Service Provider.</u> The following terms apply to Vendor's processing of Meta Tech Data as a Service Provider:

4.1 Vendor will: (i) use, collect, retain, and securely destroy Meta Tech Data solely for and at the direction of Meta Tech, for the purposes specified in the Agreement and/or any SOW thereto, and for no other individual or entity and for no other purpose; and (ii) not disclose Meta Tech Data, or any Personal Information derived from such Meta Tech Data, except for and at the direction of Meta Tech, for the purpose of providing services requested by a Meta Tech user and for no other purpose. Notwithstanding the foregoing, if and to the extent Vendor receives permission from Meta Tech to use any contractors or subcontractors in connection with the processing of Meta Tech Data (each a "***Subcontractor***"), Vendor will ensure that each Subcontractor's processing (including disclosure) of Meta Tech Data is consistent with the Agreement (which includes these Data Terms).

INB2651792



4.2  Vendor's safeguards for Meta Tech Data will include an information security and privacy program that: (i) is designed to protect the security of and protect against the unauthorized processing (including disclosure) of Meta Tech Data; and (ii) meets industry standards commensurate with Vendor's activities, and the volume and sensitivity of Meta Tech Data.

5.  <u>Third Party.</u> The following terms apply to Vendor's processing of Meta Tech Data as a Third Party:

5.1  Vendor may not use, facilitate use of, or permit a third party to use Meta Tech Data in an independent consumer application or website, unless expressly provided otherwise under the Agreement and/or any applicable SOWs thereto.

5.2  If and to the extent <u>Section 5.1</u> (above) does not apply under the Agreement, then Vendor agrees that it will, promptly following Meta Tech's request (no more than once annually in the ordinary course), certify to Meta Tech that it is in compliance with the Meta Tech Terms, its purpose(s) or use(s) for the Meta Tech Data, and that each such purpose or use complies with the Meta Tech Terms.

6.  <u>Survival.</u> Notwithstanding anything to the contrary in the Agreement, Vendor's obligations regarding Meta Tech Data will survive any termination or expiration of the Agreement or any SOW thereto to the extent Vendor continues to retain or otherwise process Meta Tech Data (as such retention or other processing may be permitted under the Agreement, SOW, or Applicable Law).

7.  <u>Interpretation.</u> Notwithstanding anything to the contrary, to the extent any term in these Data Terms conflicts or is inconsistent with any other term in the Meta Tech Terms (which includes these Data Terms), then the conflicting term that is more protective of Meta Tech Data shall apply. Without limiting the foregoing, any addendum or term that is part of the Meta Tech Terms and required under the Applicable Law of a particular jurisdiction, whether inside or outside the United States, shall at a minimum apply to the processing of Meta Tech Data that is subject to such laws. Except as expressly provided in these Data Terms, the Agreement will remain in full force and effect in accordance with its terms. If any portion of these Data Terms is found to be unenforceable, then that portion will be limited to the minimum extent necessary to remain enforceable or if necessary severed and the remaining portions will remain in full force and effect. Any failure by Meta Tech to enforce any of its rights under the Agreement will not be deemed a waiver.

# EXHIBIT 2



## Statement of Work No. 2 for "Alo Moves"

*No services may be performed until Meta Tech and Vendor sign this statement of work <u>and</u> Meta Tech issues a valid purchase order*

The purpose of this Statement of Work ("**SOW**") is to describe the Services and Deliverables that Vendor will provide to Meta Tech under the terms of the Professional Services Agreement entered into between **Andre Elijah Immersive Inc.** ("**Vendor**" or "**AEI**") and **Meta Platforms Technologies, LLC** f/k/a Facebook Technologies, LLC ("**Meta Tech**") on <u>August 16, 2022</u> (the "**Agreement**").  Capitalized terms used and not defined in this SOW have the meanings given such terms in the Agreement.

This SOW is effective as of <u>January 25, 2023</u> ("**SOW Effective Date**").  Unless otherwise terminated earlier in accordance with the terms of the Agreement, the Services and Deliverables will end on the completion of the Services and Deliverables by Vendor, which in no event shall be later than <u>February 29, 2024</u> unless mutually agreed to by the parties in writing or in email, and acceptance of the Services and Deliverables by Meta Tech.

| Vendor | Meta Tech |
|---|---|
| Project Manager: Andre Elijah | Project Manager: Katherine Bachert |
| Email: andre@andreelijah.com | Email:  kbachert@meta.com |

1. **Services**.  Vendor shall provide the following Services to Meta Tech:

   1.1 <u>Description</u>:  Vendor will develop an interactive software product tentatively titled "Alo Moves" (the "**Subject Product**"), in accordance with the Specifications set forth below and in <u>Exhibit A</u>.  Together with Statement of Work No. 1 for "Alo Moves" by and between Meta Tech and Vendor effective as of January 11, 2023 ("**SOW No. 1**"), this SOW constitutes Meta Tech's engagement of a third-party developer (i.e., Vendor) to develop the Subject Product as set forth in the Addendum to Distribution Agreement for "Alo Moves" ("**Alo Addendum**") by and between Meta Tech and Alo, LLC ("**Alo**") effective as of January 25, 2023. Vendor agrees to work with Meta Tech and Alo to develop the Subject Product and deliver Deliverables in connection with the Subject Product.

   1.2 <u>Services Location</u>.  At Vendor's facilities.

2. **Deliverables**.  Vendor will deliver the following Deliverables, which will meet the requirements set forth below and in <u>Exhibit A</u> attached hereto.

   2.1 <u>General Description of Deliverables</u>:
   The results of the Services, including but not limited to the Subject Product, which will at minimum include all of the following features and content ("*Specifications*"):

   a. Alo Moves (working title) is a hands-first (using Meta Tech's Interaction SDK), MR fitness app built for Quest 2 and Eureka from the ground up. The core app will have four main "modes".
      - **MR workouts with 3D instructors:** Alo will represent famous fitness/yoga instructors as realistic 3D avatars. AEI, working with Alo, will record poses and movements using mocap, record audio/voice over from Alo instructors, and string them together to construct a series of 100 classes across a minimum of 3 categories (Yoga, Pilates, Mindfulness). For each class, users will be able to select between up to 18 external "environments" inspired by the Alo in the Wild series to take classes. As a user progresses throughout a class, the user's room will slowly decorate with more artwork/objects to reflect the chosen environment. Users will unlock more difficult content as they progress throughout the classes.
      - **Build-Your-Own Workout:** Once a user has reached a certain level, they will be able to mix and match yoga poses & music to create their own "playlist" or class. Similar to the curated classes, users can invite friends to workout together in a multiplayer experience.
      - **MR Alo 2D video theater:** Alo and AEI will bring in Alo's entire suite of 2D videos, which users can browse and workout to either solo or with friends.
      - **Public events:** 2x a quarter, Alo will host public events with trainers/celebrities via multiplicated rooms. A handful of the most active subscribers will be selected to participate in these events, where they can take the class in real time and interact with the trainer/celebrities live. The event will be recorded and then multiplicated for a broader public audience to follow



along as a public event. These events will allow non-subscribing users to experience the events', while giving existing subscribers additional incentive to workout on a regular basis.

b.  In all modes except VIP and public events (which are only multiplayer), users can take classes in single player or multiplayer (8) using Meta Avatars. In the multiplayer experience, friends will either show up in your room (if big enough), or in a "virtual portal" for small rooms. Users will have access to multiplayer tools such as block, mute, flagging inappropriate voice notes. In addition, users will not be able to encroach onto other players' yoga mats. Given the lack of accurate body tracking, friends' avatars will follow the instructor's movements, but the users will have control over the head/voice to interact with friends during the session.

c.  Users are rewarded for completing daily challenges, with additional rewards for completing workouts multiple days in a row. Completing challenges contributes to global stats, which will enable users to unlock new content like environments, classes, yoga mat and avatar customizations. Select high-activity subscribers will be able to join public events in the same room as the influencer/celebrity instructor and enable them to interact with them directly.

d.  Subject Product will feature regular weekly content updates and include a minimum of 30 new classes each month unless otherwise required by Meta Tech and Alo.

e.  The parties agree to use good faith efforts to explore ways to enable existing Alo Moves mobile app users to get a discount on the Alo Moves MR app.

2.2  <u>Description of Documentation for Deliverables</u>:  Any reports, summaries, manuals, guides or other documentation provided to Meta Tech by Vendor.  The Documentation shall include but is not limited to the following:

- Any documentation set forth in the Milestones and Description of Deliverables in <u>Exhibit A</u>

**IMPORTANT NOTE**:  Vendor will not incorporate into or provide in conjunction with any Deliverable or create any Deliverable with a dependency upon any Background Technology or Third Party Materials without strictly complying with all of the conditions described in <u>Section 9.1(e)</u> of the Agreement.

2.3  <u>Background Technology (if any)</u>:  Are any Background Technologies incorporated into or provided in conjunction with any Deliverable or is any Deliverable dependent on any Background Technology?    Yes ☐ No ☒
*IF YES, SPECIFICALLY DESCRIBE ALL BACKGROUND TECHNOLOGY.*


2.4  <u>Third Party Materials (if any)</u>: Are any Third Party Materials incorporated into or provided in conjunction with any Deliverable or is any Deliverable dependent on any Third Party Materials?              Yes ☒ No ☐
*IF YES, SPECIFICALLY DESCRIBE ALL THIRD PARTY MATERIALS.*

<u>Third Party</u>
Unity
Photon
Normcore
AWS
Rokoko
Optitrack

<u>Meta</u>
Avatars
Custom avatars (whatever black box tech we're using to animate Trainers)
Meta Presence Platform
Destinations
Group Presence
Invites
Invite Link
Rejoin
Rosters
Quick Invites
Group Launch
Notifications
Platform capabilities
Interaction SDK
Passthrough
On-Device Debugging



Alo
Any assets, content and other materials provided in connection with or used by or on behalf of Alo in connection with the Subject Product.

**IMPORTANT NOTE**:  For any and all Open Source Software ("**OSS**") specified in Section 2.4, provide a link to the applicable license: None.

2.5   Code Review: All code submitted by Vendor will be subject to Meta Tech code review as appropriate and in accordance with Meta Tech policies.

2.6 Licensed Property. "***Licensed Property***" shall mean any assets, content and other materials provided by Alo in connection with the Alo Addendum or this SOW, or used by or on behalf of Alo in connection with the Subject Product, that is licensed to Meta by Alo under the Alo Addendum, and may include various branding and digital assets, brand guidance, music, logos, and/or other audio, visual, and/or audiovisual materials. Ownership of all Licensed Property, including, but not limited to, any intellectual property rights therein, remains with Alo.

2.6.1 Use of the Licensed Property: Solely at Meta Tech's direction, Vendor shall incorporate certain elements of the Licensed Property into the Subject Product. The Licensed Property will be depicted only in accordance with instruction provided by Meta or Alo setting forth the style, format and characterization of the Licensed Property, if any, or as otherwise Accepted by Meta. Upon Meta Tech's request, Vendor shall promptly remove elements of the Licensed Property from the Subject Product.

2.6.2 License: Subject to the terms and conditions of this SOW and the Agreement, Meta Tech hereby grants to Vendor a non-exclusive, non-assignable, royalty-free, non-transferable (subject to Section 14.2 (Assignment) of the Agreement), and non-sublicensable license to use the Licensed Property provided to Vendor by Meta Tech solely in connection with the development of the Subject Product and delivering the Deliverables in connection with the Subject Product pursuant to the terms and conditions set forth herein. For the avoidance of doubt, Vendor shall not have any right to use any Licensed Property except as specifically provided for in herein. Vendor acknowledges and agrees that the Licensed Property is the sole and exclusive property of Alo, and that any and all uses of the Licensed Property under this SOW and the goodwill associated therewith will inure to the benefit of Alo and that neither such uses nor anything contained in this SOW will give or assign Vendor or any other person or entity any right, title or interest in the Licensed Property, or in any properties owned by Alo which are not licensed hereunder, except the right to use the Licensed Property specifically in accordance with the provisions of this SOW.

3.  **Performance**.
    3.1   Reports.  If requested, Vendor will provide written reports to Meta Tech documenting Vendor's performance of the Services.

    3.2   Meta Tech Resources.  Subject to the Agreement, Meta Tech may make resources available to Vendor, provided however, that any and all property and assets, whether tangible or intangible, provided by Meta Tech to Vendor shall remain Meta Tech property.

4.  **Timeline**.  The Services will be performed and Deliverables created in accordance with the timeline specified in Exhibit A below. In addition to the foregoing, and notwithstanding anything to the contrary herein or in the Agreement, during the term of this SOW, Meta and AEI will mutually agree on detailed production cadence and project expectations in connection with the Subject Project, which in all cases will be subject to Meta's final approval, and which may include but is not limited to weekly status reports, regular delivery of meeting notes, and adjustments as needed to milestone checkpoint deliverables format and expectations.

5.  **Acceptance.**  The Services and Deliverables will conform to the requirements set forth in this SOW, including Exhibit A attached hereto, and require written acceptance from the Meta Tech Project Manager.

    5.1   Acceptance Testing: Meta Tech will have thirty (30) calendar days commencing from the receipt of each Deliverable to test that Deliverable in order to determine in its sole discretion whether that Deliverable is accepted or not accepted ("**Test Period**"). Meta Tech will use reasonable efforts to notify Vendor in writing (email is sufficient for this purpose) within ten (10) business days after the expiration of the Test Period of either its acceptance of the Deliverable ("**Acceptance**", or if a Deliverable is accepted, "**Accepted**") or describe to Vendor in reasonable detail why the Deliverable was not Accepted. Vendor acknowledges that non-Acceptance may be due to, among other things, the non-response or concerns of



INB2715252

Alo. For the avoidance of doubt, Acceptance shall not be deemed given unless Meta Tech provides written notice from the Meta Project Manager to Vendor of such Acceptance (email sufficient). Vendor shall not proceed with a subsequent Deliverable until Meta Tech has Accepted the previous Deliverable unless otherwise agreed by Meta Tech in writing.

5.2   Correction: Notwithstanding anything to the contrary in Section 9.2 (Correction of Deliverables) in the Agreement, if Meta Tech notifies Vendor that the Deliverable is not Accepted, Vendor will then have a period of ten (10) calendar days following receipt of the notice (or other time period agreed to by the parties in writing) to modify the Deliverable at Vendor's sole cost and expense. Acceptance testing and correction will be repeated as determined by Meta Tech to the degree necessary to ensure that the Deliverable meets Meta Tech's requirements, unless Meta Tech notifies Vendor that the rejection is final. In the event a Deliverable is not Accepted more than once, a third rejection of the Deliverable is final. If Vendor fails to modify the Deliverable to Meta Tech's satisfaction and Meta Tech's notifies Vendor that the rejection is final, or if Vendor fails to submit a Deliverable within thirty (30) days of its due date (as defined below), Meta Tech shall have the right to terminate this SOW and the terms set forth in Section 9.2 (Termination for Breach) of this SOW shall apply, unless otherwise mutually agreed upon in writing.

5.3   Improvements: If Meta Tech provides Vendor with requests or feedback for improvements that are outside the scope defined herein ("**Improvements**"), Vendor agrees to use commercially reasonable efforts to incorporate such Improvements into the applicable Milestone.

6.   **Fees**.
6.1   Delivery and Invoice Schedule.   Delivery and invoice for Services and Deliverables shall be as follows:

☒   **Deliverable basis as follows:** Vendor shall perform the Services and deliver the Deliverables for the fixed amount specified in Exhibit A (such fixed amount, the "**Development Payments**"), which amount shall be fully recoupable by Meta Tech.

6.2   Expenses.   No expenses are eligible for reimbursement under this SOW.

6.3   Up To and Not to Exceed Figure for Services and Deliverables.   All fees, costs and expenses for Services and Deliverables under this SOW shall be up to and not to exceed the "Maximum Amount" below, which is the combined total of the Maximum Authorized Fees and the Maximum Authorized Expenses.  Meta Tech's maximum liability for all Services and Deliverables under this SOW shall not exceed the amount of the Purchase Order(s) issued referencing this SOW.

| **Maximum Amount** | Up to and not to exceed: **$3,850,000.00** |
|---|---|

7.   **Recoupment**. The Subject Product will be published by Alo on the Meta Quest platform pursuant to the Alo Addendum.  The combined amount equal to the Development Payments hereunder, plus the amount payable by Meta Tech under SOW No. 1, which equals Four Million US dollars ($4,000,000 US dollars) total (i.e., $3,850,000 plus $150,000) (the "***Entire Development Payment***"), is fully recoupable against Alo's Developer Revenue (as defined below) for the Subject Product. Meta Tech will retain fifty (50%) of the Developer Revenue for the Subject Product until Meta's cumulative retained revenue from Developer Revenue equals the full amount of the Entire Development Payments ("***Recoupment***").   Solely until completion of Recoupment, Meta Tech will remit the Developer Revenue for the Subject Product as follows:

- 25% of the Developer Revenue will be paid to Alo.
- 25% of the Developer Revenue will be paid to Vendor.
- 50% of the Developer Revenue will be retained by Meta Tech.

Following completion of Recoupment, Meta Tech will retain twenty-five percent (25%) of the Developer Revenue and will pay Alo the remaining seventy-five percent (75%) of the Developer Revenue. Upon completion of Recoupment, Meta Tech shall have no further obligation to remit any Developer Revenue to Vendor.

"***Developer Revenue***" means seventy percent (70%) of the Net Revenues. "***Net Revenues***" means all gross revenues received by Meta Tech or its Affiliates from the sale of licenses to the Subject Product and in-Subject Product purchases, less (a) applicable taxes (excluding withholding taxes), (b) sales processing, and (c) returns, rebates, charge-backs, fraudulent transaction amounts, and refunds.



INB2715252

8.   **Privacy; Personal Data.** (i) Vendor shall comply with all requirements set forth in the Agreement in relation to personal data as well as the "Data Terms" located at: https://www.facebook.com/legal/terms/data-terms; (ii) Vendor is hereby deemed a "Service Provider" under the Data Terms; and (iii) Vendor shall be responsible for complying with all applicable data protection laws and legislation in relation to personal data (as such terms may be further defined in the Agreement).

9.   **Special Instructions**:

   9.1   <u>Termination for Convenience</u>. Meta Tech may terminate this SOW for convenience in accordance with <u>Section 12.2</u> (Termination) of the Agreement. If Meta Tech terminates for convenience at any time up to and including delivery or Acceptance of the Design Document 2 Milestone, no termination fee shall apply, and the only payment Vendor will be entitled to shall be any amount due for any unpaid Milestone(s) preceding the date of such termination, which in no event shall exceed the cumulative amount payable for Milestone 1 and Milestone 2.  If Meta Tech terminates for convenience at any time after Acceptance of the Design Document 2 Milestone, Meta Tech will provide written notice of such termination to Vendor and pay Vendor a pro-rated portion of the remaining Milestone Schedule  corresponding to the date of such termination notice plus sixty (60) days (the "***Cushion Date***"), calculated as (a) the full amount of any unpaid Milestones scheduled to be completed by the Cushion Date, plus (b) a portion of the Milestone that includes the Cushion Date, pro-rated by the number of days covered ("***Termination Fee***").

   9.2   <u>Termination for Breach</u>. Either party may terminate this SOW in the event the other party commits a material breach of this SOW that is not cured within thirty (30) days of receipt by the breaching party of written notice describing the nature of the breach. If Meta Tech terminates for breach, Meta Tech agrees to pay Vendor any unpaid balance due prior to the effective date of termination for any Milestones completed, after which Meta Tech will have no remaining financial obligation to Vendor.

   9.3   <u>Ownership</u>. In addition to the ownership provisions in <u>Section 8</u> (Ownership) of the Agreement, and notwithstanding anything to the contrary contained in this SOW or the Agreement, (a) any depiction of any element of the Licensed Property, (b) any audio, visual or audiovisual expression depicted in the Subject Product and (c) any audio, visual, audiovisual, literary, animated, artistic, dramatic, sculptural or musical works, whether finished or not, tangible or intangible, including, but not limited to, animation, drawings, designs, sketches, images, illustrations music, text, dialogue, audio tracks, sound, stories, story boards, visuals, scripts, story elements, voiceovers, logos, characters, character names, character profiles, personas, and translations, and all copyrights, trademarks and other intellectual property rights in, to and under any of the foregoing, and all embodiments thereof, created by or for the Subject Product at any time by or on behalf of Vendor, shall, as between the parties, be owned by Meta Tech, either as a work for hire or through assignment under the Agreement, and are considered Deliverables under the Agreement.

   9.4   <u>Publicity</u>. Vendor's obligations under <u>Section 5.4</u> (Publicity) of the Agreement, also apply to Alo's name, logos and trademarks and Alo and its business generally. Vendor will not make (or authorize any third party to make) any public announcement or other public disclosures related to this SOW or the Subject Product to be developed by Vendor hereunder without the prior written approval of Meta Tech.

   9.5   <u>Legal Notices and Credits</u>. Vendor will display such legal notice(s) in the Product for Alo and Meta Tech as directed by Meta Tech. Vendor acknowledges and agrees that Meta Tech and Alo shall determine all aspects of the "look and feel," layout, and implementation (including the content, size, placement, duration and other matters related thereto) of the credits included in the Subject Product.

| Accepted and agreed to by: | Accepted and agreed to by: |
|---|---|
| **Andre Elijah Immersive Inc.** | **Meta Platforms Technologies, LLC** |
| Signature: *Andre Elijah* | Signature: *Tamara Sciamanna* |
| Andre Elijah (Jan 25, 2023 15:29 PST) | Tamara Sciamanna (Jan 25, 2023 15:41 PST) |
| Name: Andre Elijah | Name: Tamara Sciamanna |
| Title: Owner | Title: Authorized Representative |



Exhibit A

| Milestone | Description of Deliverables | Required Date of Delivery | Amount (in US dollars) |
|---|---|---|---|
| 1. | **Full execution of SOW** | ----- | $300,000 |
| 2. | **Design Document 2**<br><br>This Milestone deliverable is a Fitness Design documentation milestone, communicating the design, art, and technical specifications that frame the product. The Fitness Design Documentation should detail the list of poses, instructors, number and length of classes that the app will include at launch. The deliverable will additionally include written documentation containing an update on progress pertaining to the next Milestone, and confirmation that such Milestone is on target for delivery on the stated delivery date and in accordance with agreed specifications. Once approved, deviations from delivered documentation must be communicated and mutually agreed upon in writing if they are inconsistent with prior documentation, the Milestones or Specifications in the SOW. | February 28, 2023 | $50,000 |
| 3. | **Mechanical Proof of Concept ("MPOC") Checkpoint**<br><br>This Milestone deliverable is a playable build on the target device that demonstrates at least one of each type of core VR-specific mechanic (e.g.,locomotion/movement and controller interactions) for the 3D avatar, multiplayer workout experience.  The build provides functional solutions to key VR design challenges. Aside from the build itself, there are no specific art, code, or design requirements for this milestone. The deliverable will additionally include written documentation containing an update on progress pertaining to the next Milestone, and confirmation that such Milestone is on target for delivery on the stated delivery date and in accordance with agreed specifications. | February 28, 2023 | $0 |
| 4. | **Avatar Design Document 1**<br><br>This Milestone deliverable is an Avatar Design documentation 1 milestone, communicating the design, art, and technical specifications that frame the product. The Avatar Design Document will include a minimum of 2 design options for 3D Alo | March 21, 2023 | $50,000 |

INB2715252


| | | | |
|---|---|---|---|
| | trainer avatars. The deliverable will additionally include written documentation containing an update on progress pertaining to the next Milestone, and confirmation that such Milestone is on target for delivery on the stated delivery date and in accordance with agreed specifications. Once approved, deviations from delivered documentation must be communicated and mutually agreed upon in writing if they are inconsistent with prior documentation, the Milestones or Specifications in the SOW. | | |
| 5. | **Mechanical Proof of Concept**<br><br>This Milestone deliverable is a playable build on the target device that demonstrates at least one of each type of core VR-specific mechanic (e.g.,locomotion/movement and controller interactions) in the 2D experience and the 3D avatar trainer-led workouts. The build provides functional solutions to key VR design challenges. Aside from the build itself, there are no specific art, code, or design requirements for this milestone. The deliverable will additionally include written documentation containing an update on progress pertaining to the next Milestone, and confirmation that such Milestone is on target for delivery on the stated delivery date and in accordance with agreed specifications. | March 31, 2023 | $600,000 |
| 6. | **Avatar Design Document 2**<br><br>This Milestone deliverable is an Avatar Design documentation 2 milestone, communicating the design, art, and technical specifications that frame the product. The Avatar Design Document will include a minimum of 1 photorealistic design option for 3D Alo trainer avatars. The deliverable will additionally include written documentation containing an update on progress pertaining to the next Milestone, and confirmation that such Milestone is on target for delivery on the stated delivery date and in accordance with agreed specifications. Once approved, deviations from delivered documentation must be communicated and mutually agreed upon in writing if they are inconsistent with prior documentation, the Milestones or Specifications in the SOW. | April 12, 2023 | $50,000 |

INB2715252



| 7. | **Vertical Slice Checkpoint**<br><br>This Milestone deliverable is a playable build which includes a Vertical Slice and an Art Benchmark for the MR, 3D avatar-trainer led workouts. The Vertical Slice is a playable build on the target device in which all core features of the app are demonstrated and all app modes are represented. Vertical Slice demonstrates the app's core loop and moment-to-moment experience and includes at least one asset in every content category (Character, Environment, FX, Audio). If the app contains multiplayer, multiplayer must be functional. The Art Benchmark must be at minimum a single contained scene / play area that demonstrates near-final art and visuals for at least one environment. The Art Benchmark will be considered the visual target for future submissions. The Art Benchmark can be non-interactive but must be usable on target hardware. The Vertical Slice milestone marks the end of pre-production milestones. The deliverable will additionally include written documentation containing an update on progress pertaining to the next Milestone, and confirmation that such Milestone is on target for delivery on the stated delivery date and in accordance with agreed specifications. | April 29, 2023 | $0 |
| --- | --- | --- | --- |
| 8. | **Vertical Slice**<br><br>This Milestone deliverable is a playable build which includes a Vertical Slice and an Art Benchmark for the two core experiences - 2D MR, co-watching and the MR, 3D avatar-trainer led workouts. The Vertical Slice is a playable build on the target device in which all core features of the app are demonstrated and all app modes are represented. Vertical Slice demonstrates the app's core loop and moment-to-moment experience and includes at least one asset in every content category (Character, Environment, FX, Audio). If the app contains multiplayer, multiplayer must be functional. The Art Benchmark must be at minimum a single contained scene / play area that demonstrates near-final art and visuals for at least one environment. The Art Benchmark will be considered the visual target for future submissions. The Art Benchmark can be non-interactive but must be usable on target hardware. The Vertical Slice milestone marks the end of pre-production milestones. The deliverable will additionally include written documentation containing an update on progress pertaining to the next Milestone, and confirmation that such Milestone is on target for delivery on the stated delivery date and in accordance with agreed specifications. | May 13, 2023 | $600,000 |

INB2715252



| 9. | **Alpha Checkpoint**<br><br>This Milestone deliverable is a feature-complete build for the MR, 3D Avatar-trainer led workouts. running on the target device. All major systems/features must be complete and working (although they aren't expected to be bug free). Core product experience loops are represented and demonstrable, and the app must be playable from start to finish without being blocked by gating bugs (workarounds okay). Product scope is expected to be near final. This milestone must run on target hardware at testable performance. The deliverable will additionally include written documentation containing an update on progress pertaining to the next Milestone, and confirmation that such Milestone is on target for delivery on the stated delivery date and in accordance with agreed specifications. | June 30, 2023 | $0 |
| --- | --- | --- | --- |
| 10. | **Alpha**<br><br>This Milestone deliverable is a feature-complete build running on the target device. All major systems/features must be complete and working (although they aren't expected to be bug free). Core product experience loops are represented and demonstrable, and the app must be playable from start to finish without being blocked by gating bugs (workarounds okay). Product scope is expected to be near final. This milestone must run on target hardware at testable performance. The deliverable will additionally include written documentation containing an update on progress pertaining to the next Milestone, and confirmation that such Milestone is on target for delivery on the stated delivery date and in accordance with agreed specifications. | July 22, 2023 | $600,000 |
| 11. | **Beta**<br><br>This Milestone deliverable is a fully functional feature-complete and content-complete app that is approved to enter the QA process. All assets are indicative of final quality, and the app runs at shippable framerate on the target device; limited dips in performance such that the objective playability/interactivity of the product is not affected are permitted. Product can be played from beginning to end without being blocked by gating bugs. AEI may continue to polish the build until final QA entry milestone. The deliverable will additionally include written documentation containing an update on progress pertaining to the next Milestone, and confirmation that such Milestone is on target for | August 4, 2023 | $600,000 |

INB2715252



| | | | |
|---|---|---|---|
| | delivery on the stated delivery date and in accordance with agreed specifications. | | |
| 12. | **QA Entry**<br><br>This Milestone deliverable is a fully functional feature-complete and content-complete app that is approved to enter the QA process. All assets are indicative of final quality, and the app runs at shippable framerate on the target device; limited dips in performance such that the objective playability/interactivity of the product is not affected are permitted. Product can be played from beginning to end without being blocked by gating bugs. The deliverable will additionally include written documentation containing an update on progress pertaining to the following Milestone, and confirmation that such Milestone is on target for delivery on the stated delivery date and in accordance with agreed specifications. | End of Aug 2023 (specific date to be confirmed by Meta Dev Strat/QA team) | $300,000 |
| 13. | **Store Launch**<br><br>This Milestone deliverable is the release build to the Meta Quest Store and is fully functional with all required fixes addressed. This build must include all of the features and content set forth in the agreed specifications. Any waivers have been properly approved by Meta. | November 2023 (specific date to be confirmed by Meta Dev Strat/QA team) | $300,000 |
| 14. | **Update Checkpoint 1**<br><br>This Milestone deliverable is an MPOC of the multiplayer, celebrity/trainer public event experience. The build provides functional solutions to key VR design challenges. Aside from the build itself, there are no specific art, code, or design requirements for this milestone. The deliverable will additionally include written documentation containing an update on progress pertaining to the next Milestone, and confirmation that such Milestone is on target for delivery on the stated delivery date and in accordance with agreed specifications. | December 16, 2023 | $0 |



| 15. | **Update Checkpoint 2**<br><br>This Milestone deliverable is an Alpha of the multiplayer, celebrity/trainer public event experience. This Milestone deliverable will include a feature-complete experience of the celebrity/trainer public event experience running on the target device. All major systems/features must be complete and working (although they aren't expected to be bug free). Core product experience loops are represented and demonstrable, and the app must be playable from start to finish without being blocked by gating bugs (workarounds okay). Product scope is expected to be near final. This milestone must run on target hardware at testable performance. AEI will run a dry-run of a live experience with Meta and Alo to test out the build. The deliverable will additionally include written documentation containing an update on progress pertaining to the next Milestone, and confirmation that such Milestone is on target for delivery on the stated delivery date and in accordance with agreed specifications. | January 2024 | $0 |
| --- | --- | --- | --- |
| 16. | **Update**<br><br>This Milestone deliverable is the release of the multiplayer, celebrity/trainer public event experience to the Meta Quest Store. | February 2024 | $400,000 |
| **Maximum Authorized Fees Up to and Not to Exceed** | | | **$3,850,000** |

# EXHIBIT 3

DocuSign Envelope ID: 05035D64-D115-4D4C-90E8-A8F040869899

# SOFTWARE MAINTENANCE AGREEMENT

THIS SOFTWARE MAINTENANCE AGREEMENT (*Agreement*) is executed as of March 1, 2023 (*Effective Date*) by and between Andre Elijah Immersive Inc. (*Service Provider*) and Alo LLC, a limited liability company registered in California (*Company*). Service Provider and Company are referred to separately as *Party* and jointly as the *Parties*.

WHEREAS, Company and Meta Platforms Technologies, LLC (f/k/a Facebook Technologies, LLC or Oculus VR, LLC) ("Meta") previously entered into that certain Distribution Agreement on November 28, 2022 ("Meta-Alo Distribution Agreement") and Addendum to Distribution Agreement ("Meta-Alo Addendum"), (together, the "Meta-Alo Agreement");

WHEREAS, the Meta-Alo Agreement provides, among other things, that Meta will engage Service Provider to develop the Subject Product, as defined therein, and Company agrees to such engagement;

WHEREAS, Company desires to separately engage and compensate Service Provider for the Services described herein; and

WHEREAS, Service Provider wishes to provide the Services to Company for compensation.

NOW, THEREFORE, in consideration of the promises and the mutual covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows.

1.  SERVICES

1.1    **Scope of Services**. Service Provider shall provide the following services to Company during the Term for the Alo Moves App being developed by AEI and Meta for Company pursuant to the Meta-Alo Agreement (the "Alo Moves App"): (a) maintenance of the Alo Moves App on any Meta virtual reality platform (including Meta Quest), or on any other virtual reality platform which the Alo Moves App is ported to, inclusive of all costs and expenses, (b) maintain the multi-player server and infrastructure, inclusive of all costs and expenses; and (c) create and upload a minimum of 30 new classes on the Alo Moves App per month, and host at least 2 public events per quarter (the *Services*).

1.2    **Exclusions from Services**. Service Provider shall not provide any maintenance services, or any services related to any multi-player server or infrastructure, or any other related services, except as explicitly set out herein related to the Alo Moves App. Service Provider shall have no maintenance obligations with respect to any anomalies or problems not caused by the Alo Moves App, or to modifications to the Alo Moves App made by someone other than the Service Provider.

1.3    **Company responsibilities**. In connection with Service Provider's provision of the Services, Company acknowledges that Company has the responsibility to do each of the following: (a) supply Service Provider with access to and use of all information, relevant software, and facilities determined to be necessary to render the Services, (b) perform any tests or procedures recommended by Service Provider for the purpose of identifying and/or resolving any problems, and (c) maintenance of a procedure external to the Alo Moves App for reconstruction of lost or altered files, data, or programs to the extent deemed necessary by Company.

1.4    **Term.** The term of engagement commences on the Effective Date and shall continue until the Agreement is terminated pursuant to Article 4 (the *Term*).

2. **PAYMENT**

**2.1    Service Fee.** During the Term (Article 4) of the Agreement, Company shall pay Service Provider a fee of 10% of the Total Gross Revenue of the Alo Moves App (the ***Service Fee***), in accordance with the terms described herein. ***Total Gross Revenue*** means the money received by Company from the sale of licenses to the Alo Moves App on any Meta virtual reality platform (including Meta Quest), or on any other virtual reality platform which the Alo Moves App is ported to, without any deduction for costs, fees, expenses, losses, or liabilities of any party.

**2.2    Payment terms.** Payment of Service Fees by Company shall begin only after completion of recoupment for Meta and Service Provider for the development of the Alo Moves App pursuant to the terms of the Meta-Alo Agreement. Following completion of such recoupment, Company shall pay Service Provider the Service Fee on a monthly basis, within 10 days after the end of each month, for all fees due and payable during the prior one-month period. Company shall issue to Service Provider a billing statement at such time, which sets out the period for which payment is made, the Total Gross Revenue, and the sum equal to 10% of the Total Gross Revenue.

**2.3    Accounting.** Company shall maintain a correct and accurate record of all sums it receives in payment in relation to the Alo Moves App, inclusive of the total sum of the Total Gross Revenue. Upon written request, within thirty (30) business days of receipt of the request, Company shall provide to Service Provider written records evidencing such sums.

**2.4    Porting.** After one (1) year from the Effective Date, Service Provider, with prior notice and consent of the Company, may communicate with third party companies to which the Alo Moves App may be ported, in relation to porting the Alo Moves App to their platforms. Where the Alo Moves App is ported to a third party's platform, which may only be done pursuant to Company's prior written consent, then Service Provider shall perform the porting services, and shall be compensated by such third party as agreed between Company, Service Provider and such company for the porting services.

**2.5    Stop-loss.** The Parties acknowledge that the cost to perform the Services is variable, and may, though it is not expected to do so, exceed the Service Fee during any given one-month period; therefore, where the costs to perform the Services hereunder exceed the Service Fee during any one-month period, then the Service Provider shall perform the Services up to the sum of such amount, and any excess shall be paid for or otherwise mitigated by Company, but in no event shall the costs to perform the Services for any one-month period, together with any excess, exceed 15% of Total Gross Revenue for that particular one-month period.

3. **CONFIDENTIAL INFORMATION**

**3.1    Confidentiality obligation.** Each Party shall use the other party's Confidential Information solely in accordance with the provisions of this Agreement and shall not disclose, or permit to be disclosed, the same, directly or indirectly, to any third party without the other party's prior written consent, and shall safeguard the other party's Confidential Information from unauthorized use and disclosure using measures that are equal to the standard of performance used by such party to safeguard its own Confidential Information of comparable value, but in no event less than reasonable care. Each Party shall take appropriate action (by instructions, agreement, or otherwise) with its employees and advisors to satisfy its obligations under this Agreement. Each Party shall notify the other of any breaches of security. Each Party shall be responsible to the other for any violation of this Agreement by its own officers, directors, employees, agents, subcontractors, or advisors.

**3.2    Exceptions to confidentiality obligation.** Confidential Information of a party does not include information which at the time of disclosure to the receiving party is available to the public from the disclosing party without restriction, is lawfully obtained by the receiving party from a third party that is not restricted from disclosing such information, is known to the receiving party without

confidential restriction prior to disclosure, or is at any time developed by the receiving party without using or relying upon the Confidential Information disclosed by the disclosing party. If any party is requested or required to disclose the other party's Confidential Information by a government authority or by court-ordered subpoena, or similar process, that party shall, if not prohibited by Federal or state law or by a court or administrative order, promptly notify the other party of such request or requirement so that the other party may seek an appropriate protective order or other appropriate relief and/or waive compliance with provisions of this Agreement, and if, in the absence of such relief or waiver hereunder, any party or its representatives are, in the opinion of its counsel, legally compelled to disclose Confidential Information, then that party may disclose such Confidential Information to the person compelling disclosure as is, according to such opinion, required, without liability hereunder. Both Parties agree that neither party shall disclose the terms of this Agreement, except as required by law. Notwithstanding anything contained in this Agreement to the contrary, a party shall have the right to disclose this Agreement in accordance with applicable securities laws; provided, that such disclosing party shall use reasonable efforts (in coordination with the other) to seek confidential treatment of any pricing or other sensitive and confidential terms set forth in this Agreement. Notwithstanding anything contained in this Agreement to the contrary, a party shall have the right to disclose the terms and conditions of this Agreement (not the Confidential Information exchanged hereunder) to its attorneys, accountants, other professionals, and to regulators in accordance with applicable securities, insurance, or healthcare laws, and to potential investors, lenders, purchasers of the party's business, merger parties, and underwriters in connection with their due diligence in future financings, loan transactions, acquisitions, mergers, or public offerings; provided, that such disclosing party shall use reasonable efforts (in coordination with the other) to seek confidential treatment of any sensitive and confidential terms and conditions set forth in this Agreement.

**3.3    Definition of Confidential Information.** *Confidential Information* means all software, documentation, information, data drawings, benchmark tests, specifications, trade secrets, object code and machine-readable copies of the software, source code of or relating to the software, and any other proprietary information (including proprietary information of third parties) supplied by Company or Service Provider and marked as "Confidential Information" or otherwise identified to the receiving party as Confidential Information.

**4.    TERM & TERMINATION**

**4.1    Term:** This Agreement commences on the Effective Date and continues until terminated in accordance with this Article 4 (the "Term").

**4.2    Mutual termination.** The Agreement may be terminated by mutual written agreement of the Parties.

**4.3    Termination for material breach**. Either Party may terminate the Agreement for material breach, where the non-breaching Party notifies the breaching Party in writing, specifying the breach in detail, and where the breaching Party does not cure the breach within 30 business days of receipt of the written notice. Material breach shall include, but is not limited to, non-payment, and non-performance of the Services.

**4.4    Termination for Convenience by Company**. Company may terminate this Agreement for convenience at any time after one (1) year from the Effective Date, upon thirty (30) days' prior written notice to Service Provider.  This Agreement shall also terminate automatically in the event the Meta-Alo Agreement is terminated in accordance with the terms therein.

**4.5    Survival**. On expiry or termination of the Agreement, the following provisions shall survive and remain in effect: Article 3 (Confidentiality) and Article 4 (Term & Termination). Termination of

DocuSign Envelope ID: 05035D64-D115-4D4C-90E8-A8F040869889

the Agreement shall not have any effect on any outstanding rights or obligations of the Parties which occurred prior to termination and have not been satisfied hereunder.

**4.6    Effect of termination**. Following termination of the Agreement for any reason, Company shall immediately pay all previously due and payable Service Fees to Service Provider. Service Provider shall:

**(a)**    immediately deliver to Company all Company property and confidential information in Service Provider's possession or under Service Provider's control;

**(b)**    fully cooperate with Company in all matters relating to the winding up of Service Provider's pending work; and

**(c)**    subject to Company's data retention guidelines, irretrievably delete any confidential information relating to the business of Company stored on any magnetic or optical disk or memory and all matter derived from such sources which is in his possession or under his control outside the premises of Company.

**4.7    Non-disparagement.** Regardless of any dispute that may arise in the future, neither Party may disparage, criticize or make statements which may be interpreted as negative, detrimental, or injurious to the other to any individual, whether in private or in public.

**5.    DISCLAIMER**

**5.1    SERVICE PROVIDER MAKES NO ADDITIONAL WARRANTIES, EXPRESS, IMPLIED, ARISING FROM COURSE OF DEALING OR USAGE OF TRADE, OR STATUTORY, AS TO THE SOFTWARE OR ANY MATTER WHATSOEVER. IN PARTICULAR, ANY AND ALL WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, AND ANY WARRANTIES ARISING AT LAW OR FROM COURSE OF DEALING, COURSE OF PERFORMANCE, OR USE OF TRADE ARE EXPRESSLY EXCLUDED. COMPANY HEREBY DISCLAIMS ANY RELIANCE ON ANY WARRANTY OR REPRESENTATION NOT EXPRESSLY SET FORTH IN THIS AGREEMENT.**

**6.    LIMITATION OF LIABILITY**

**6.1    EXCEPT FOR LIABILITY ARISING FROM INTENTIONAL BREACH OF THE CONFIDENTIALITY OBLIGATION SET FORTH IN ARTICLE 3 OR LIABILITY PURSUANT TO ARTICLE 7 (INDEMNIFICATION), IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER OR ANY THIRD PARTY FOR ANY LOSS OF PROFITS, LOSS OF USE, BUSINESS INTERRUPTION, LOSS OF DATA, COST OF RECREATING LOST DATA, COST OF COVER OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND IN CONNECTION WITH OR ARISING OUT OF THE AGREEMENT, INCLUDING, BUT NOT LIMITED TO, THE FURNISHING, PERFORMANCE OR USE OF THE SOFTWARE, MAINTENANCE AND SUPPORT, OR OTHER ITEMS OR SERVICES PROVIDED HEREUNDER OR ANY DELAY IN DELIVERY OR FURNISHING THE SOFTWARE, MAINTENANCE AND SUPPORT, OR SAID ITEMS OR SERVICES EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING ANY TERM OF THE AGREEMENT, AND EXCEPTING LIABILITY PURSUANT TO ARTICLES 3 AND 7, EITHER PARTY'S MAXIMUM AGGREGATE LIABILITY (WHETHER IN CONTRACT OR IN TORT OR UNDER ANY OTHER FORM OF LIABILITY) FOR DAMAGES OR LOSS, HOWSOEVER ARISING OR CAUSED, SHALL IN NO EVENT BE GREATER THAN THE AMOUNT OF THE SERVICE FEES DURING THE LAST TWELVE (12) MONTHS PRIOR TO THE DATE**

OF THE EVENT GIVING RISE TO SUCH LIABILITY. THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

**7.    INDEMNIFICATION**

**7.1**    Company agrees to defend (at Service Provider's option), indemnify, and hold harmless Service Provider and its affiliates, and its and their respective licensors, licensees and its and their directors, officers, employees, contractors, agents, representatives, third party service providers, successors, and assigns (collectively, "Service Provider Representatives") from and against any claim, demand, threat, suit or proceeding brought by a third party arising out of or related to any breach or alleged breach by Company of this Agreement, including for any infringement or alleged infringement of the claimant's trademarks, patents, copyrights, or intellectual property rights (collectively, "**Claim**") not caused by Service Provider in the provision of the Services and shall pay any and all losses, liability, damages, expenses (including, without limitation, reasonable attorneys' fees and expenses), and any final judgments awarded or settlements entered into with Service Provider's prior written authorization. The Parties agree that the limitations on liability contained in Article 6 of this Agreement shall not apply to the indemnity obligation set forth in this Article.

**7.2**    Service Provider agrees to defend (at Company's option), indemnify, and hold harmless Company and its affiliates, and its and their respective licensors, licensees and its and their directors, officers, employees, contractors, agents, representatives, third party service providers, successors, and assigns (collectively, "Company Representatives") from and against any claim, demand, threat, suit or proceeding brought by a third party arising out of or related to any breach or alleged breach by Service Provider of this Agreement, including for any infringement or alleged infringement of the claimant's trademarks, patents, copyrights, or intellectual property rights (collectively, "**Claim**") caused by Service Provider in the provision of the Services or relating to any applicable Service Provider intellectual property rights in technology (including without limitation any licensed engine tech or related or similar third party intellectual property) used in or for the Alo Moves App, and shall pay any and all losses, liability, damages, expenses (including, without limitation, reasonable attorneys' fees and expenses), and any final judgments awarded or settlements entered into with Company's prior written authorization. The Parties agree that the limitations on liability contained in this Agreement shall not apply to the indemnity obligation set forth in this Article.

**7.3**    Any party seeking indemnification pursuant to this Agreement ("Indemnitee") agrees to provide written notice to the other party ("Indemnitor") promptly of any Claim for which Indemnitee seeks indemnification. Indemnitee may, at its option, permit the Indemnitor to control the defense of such Claim with counsel of Indemnitor's choice, provided that the Indemnitor will not settle or resolve any such Claim in a manner that imposes any liability or obligation on the Indemnitee, or that affects the rights of the Indemnitee, without obtaining the Indemnitee's prior written approval. In the event the Indemnitor is permitted to control the defense of a Claim, the Indemnitee may, at its own expense, assist in the defense of such Claim if it so chooses.

**8.    MISCELLANEOUS**

**8.1    Status.** The relationship of Service Provider and Company shall be that of independent contractor and nothing in the Agreement shall render Service Provider an employee, worker, agent, or partner of Company, and Service Provider shall not hold one's self out as such.

**8.2    Exclusivity**. During the Term of this Agreement, Service Provider is the sole and exclusive party which may provide the Services to Company.

**8.3    Third party rights.** An entity or individual who is not a party to the Agreement shall not have any rights thereunder.

**8.4     Notices.** Any notices provided under the Agreement shall be in writing and shall be deemed effective upon the earlier of (i) personal delivery (including personal delivery by hand); (ii) email (with confirmation of receipt) or (iii) the third day after mailing by first class mail, to Company at its primary office location and to Service Provider at Service Provider's address as listed on Company payroll.

**8.5     Severability.** Whenever possible, each provision of the Agreement shall be interpreted in such manner as to be effective and valid under applicable law. Where any provision or part provision of the Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or part provision, or any determination in another jurisdiction. The Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or part provision was never in the Agreement.

**8.6     Waiver; amendment**. No failure or delay by a Party to exercise any right or remedy provided under the Agreement or by law shall constitute a waiver of that or any other right or remedy, nor shall it preclude or restrict the further exercise of that or any other right or remedy. No single or partial exercise of such right or remedy shall preclude or restrict the further exercise of that or any other right or remedy. The Agreement may be amended only by written agreement executed by the Parties.

**8.7     Entire agreement.** The Agreement constitutes the entire agreement between Service Provider and Company. The Agreement is the complete, final, and exclusive embodiment of the agreement of Service Provider and Company with regard to this subject matter and supersedes any prior oral discussions or written communications and agreements. The Agreement is entered into without reliance on any promise or representation other than those expressly contained in the Agreement, and it cannot be modified or amended except in writing signed by an authorized officer of Company. For the avoidance of doubt, this Agreement does not supersede the rights and obligations that exist between and among Meta, Company and Service Provider relating to the development of the Alo Moves App, including the Meta-Alo Agreement or any related agreements between Service Provider and Meta.

**8.8     Counterparts.** The Agreement may be executed in any number of counterparts, including by facsimile delivery, all of which taken together shall constitute one and the same agreement.

**8.9     Headings.** The headings of the sections of the Agreement are inserted for convenience only and shall not be deemed to constitute a part of the Agreement nor to affect the meaning thereof.

**8.10     Successors and assigns.** The Agreement is intended to bind and inure to the benefit of and be enforceable by Service Provider and Company, and their respective successors, assigns, heirs, executors and administrators, except that Service Provider may not assign any of Service Provider's duties under the Agreement and Service Provider may not assign any of Service Provider's rights under the Agreement without the written consent of Company, which shall not be withheld unreasonably.

**8.11     Attorney fees.** If either Party brings any action to enforce its rights under the Agreement, it shall be entitled to recover its reasonable attorneys' fees and costs incurred in connection with such action should it prevail in the action.

**8.12     Governing law; jurisdiction.** The Agreement shall be construed in accordance with, and all matters arising out of or relating in any way, whether in contract, tort or otherwise, to the Agreement shall be governed by the law of California. Each Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the courts of California without giving effect to principles of conflict of laws. Each Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, the defense of an inconvenient forum and any objection which it may now or hereafter have to the laying of venue of any

suit, action or proceeding arising out of or relating to the Agreement in any court referred to in this paragraph.

**8.13   Independent Counsel.** Service Provider has been provided with an opportunity to consult with Service Provider's own counsel with respect to the Agreement. Service Provider acknowledges that Company or its counsel did not represent Service Provider with respect to the Agreement.

**IN WITNESS WHEREOF,** each party has duly read, understood and executed the Agreement, in counterpart, as of the date first set forth above by their duly authorized representatives.

**Company**  Alo, LLC

By: _Savio Thattil_
    53A383FD478440B...

Name: Savio Thattil

Title: CDO

**Service Provider**  Andre Elijah Immersive Inc.

By: _Andre Elijah_
    26A4B23E6BC049C...

Name: Andre Elijah

Title: Founder